Robert Fred SWEARNGIN, Appellant,

v.

SEARS ROEBUCK & COMPANY, a corporation, Appellee.

No. 8626.

United States Court of Appeals Tenth Circuit.

March 30, 1967.

**638**

John E. Shamberg, Edward G. Collister, Jr., Jacob F. May, Kansas City, Kan. (Joseph Cohen, Charles S. Schnider, Gerald T. Elliott, Kansas City, Kan., on brief), for appellant.

J. Willard Haynes, Kansas City, Kan. (Sam D. Parker, Joseph E. Stevens, Jr., Daniel M. Dibble, Kansas City, Mo., on brief; Arnstein, Gluck, Weitzenfeld & Minow, Chicago, Ill., and Lathrop, Righter, Gordon & Parker, Kansas City, Mo., of counsel), for appellee.

Before PICKETT, LEWIS, and HICKEY, Circuit Judges.

HICKEY, Circuit Judge.

On April 25, 1961, Gary Whittaker, a home owner in Mission Hills, Kansas, purchased a 20″ Craftsman Rotary Power Lawn Mower, Model No. 9135, from appellee's retail establishment in Kansas City, Missouri. The tradename "Craftsman" was the sole property of appellee. The mower housing was manufactured, and the machine assembled, by a wholly owned subsidiary corporation. On the following day an employee of Whittaker used the machine to mow the lawn of the Whittaker residence in Mission Hills, Kansas. While the lawn was being mowed, the appellant, Robert Fred Swearngin, a police officer on patrol in an automobile with the window of his vehicle rolled down drove by the residence. When appellant was approximately 26 feet from the operating machine, he heard the mower make a noise and saw it throw a clod of grass from its discharge chute. Immediately thereafter, the left lens of his sunglasses was shattered and he was struck in the eye by a piece of stick several inches long. The stick penetrated the left eye, and rendered it blind for all practical purposes.

The appellant instituted an action against Whittaker and his employee. This action was settled when appellant gave Whittaker and his employee a covenant not to sue in return for the payment of $18,500.00. Thereafter, this action was instituted against the appellee, Sears Roebuck & Company, The trial resulted in a jury verdict for the appellant in the amount of $48,000.00 for which judgment was entered.

At the close of appellant's evidence and at the close of all the evidence, appellee made motions for a directed verdict. Subsequently, and within ten days after the verdict and judgment had been entered, appellee filed motion for judgment notwithstanding verdict or, in the alternative, for new trial pursuant to Rules 50(b) and 59 of the F.R.Civ.P.

After considering the arguments on the motions, the court granted the motion for judgment notwithstanding verdict authorized by Rule 50(b), and conditionally denied appellee's alternative motion for a new trial under Rule 50(c). The court also ordered, upon agreement of the parties, a remittitur in the amount of $18,500.00 reducing the amount of judgment to $29,500.00.

Notice of appeal was filed and the matter came to this court. As provided in Rule 50(c), appellee, without filing a cross appeal, asserted error in the district court's refusal to grant the motion for

new trial. Appellant has replied to these assertions. The new subdivision (c) seeks to regularize the procedure enunciated in Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940); Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 67 S.Ct. 752, 91 L.Ed. 849; Globe Liquor Co. v. San Roman, 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177; Johnson v. New York, N. H. & H. R. R., 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77.

■ It may be appropriate at this point to state the general rule with regard to the jurisdiction of the court. " * * * [T]he general rule is that where an act of omission or commission occurs at one place and resulting death, personal injury, or damage takes place at another, the situs of the actionable wrong is the place at which the death, personal injury or property damage takes place. [numerous citations]." Richards v. United States, 285 F.2d 521, 523 (10 Cir. 1960); affm'd 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492.

We first consider the granting of the motion for judgment notwithstanding the verdict.

The following standards have been established:

"A motion for judgment notwithstanding the verdict is actually merely a renewal of a previous motion for a directed verdict as to which the court has reserved decision. Thus the standard is the same for both motions as to when they should be granted. Motions of this kind raise the question whether there is or was any substantial evidence to take the case to the jury. Since, if granted, they deprive the party of a determination of the facts by a jury, they should be cautiously and sparingly granted. The court may not substitute its judgment on a question of fact for that of the jury, nor direct a verdict because the evidence decidedly preponderates for the moving party. * * *

The propriety of granting or denying a motion for a directed verdict is test-ed both in the trial court and on appeal by the same rule. The trial court must view the evidence and all inferences most favorably to the party against whom the motion is made. The reviewing court must do the same with respect to a judgment entered on a directed verdict or the denial of a motion for a directed verdict or a judgment entered notwithstanding the verdict. The decisions are many and the rule is the same both on appeal, and on the hearing of the motion in the trial court." 2B Barron & Holtzoff, Fed. Prac. and Proc., § 1075, at 375, 378 (Rules ed. 1961).

This court's most recent statement of the standard is:

"It seems hardly necessary to repeat the rule in this circuit that a trial judge may grant a directed verdict 'only when in his considered judgment it would have no foundation in fact, and the court in the exercise of its judicial discretion would be required to set it aside.' * * * Although the rule is simple, its application by a trial court 'is always perplexing and necessarily subject to the human equation.' In borderline cases it is difficult to exclude the personal equation, but a trial judge must recognize the possibility that, 'whatever might be his own view, other fair-minded men might reasonably arrive at a contrary conclusion.' In passing on a motion for a directed verdict he must view the evidence in the light most favorable to the opposing party. Although a scintilla of evidence is not sufficient to justify submitting a case to the jury, a verdict may not be directed unless the evidence points all one way and is susceptible of no reasonable inferences which sustain the position of the party against whom the motion is made." Christopherson v. Humphrey, 366 F.2d 323, 325–326 (10 Cir. 1966). See also Hardware Mutual Ins. Co. v. Lukken, 372 F.2d 8 (10 Cir. Jan. 1967).

■ These standards limit the granting of judgment notwithstanding the verdict. "It is a formal finding, pursu-

ant to direction, that the plaintiff or the defendant as the case may be, has shown no right to relief on any of his claims * * *." 2B Barron & Holtzoff, Fed.Prac. & Proc. § 1075, at 377, (Rules ed. 1961).

This court has said of the manufacturer's liability in products cases:

"In cases involving food for human consumption Kansas has held on public policy grounds that a manufacturer, intermediate handler, or retailer is 'an insurer that such food will cause no harmful effects because of deleterious matter therein.' This rule has been extended to include cosmetics, and containers of liquid beverages. In two cases arising in Kansas this court has affirmed the liability of a manufacturer for defective merchandise." Burgess v. Montgomery Ward and Company, 264 F.2d 495, 496–497 (10 Cir. 1959).

Volume 1, Frumer-Friedman, Products Liability, 1966 Cumulative Supplement, page 3, quotes from the Medical Tribune, May 26, 1965:

"It has become increasingly apparent that lawn mowers, especially the bigger power models, represent a not inconsiderable threat to safety. The National Safety Council estimates that 80,000 persons are injured annually by lawn mowers. * * *"

■ With these rules and precedents in mind, we conclude that the record reflects a foundation of justifiable inferences upon which reasonable minds might differ. Therefore, appellant made a showing of his right to relief and the controversy was properly submitted to the jury.

Having made the above determination, we will answer the various questions raised by the appellant and appellee.

The threshold question of negligence, or stated in different language, the unsafe design and the determination that the power mower was a dangerous instrument, is the result of the testimony adduced from experts.

Appellant's expert testified:

"I am saying in my opinion that that machine is an unsafe design and was not given the design consideration that it should have in order to protect the general public. * * * Then I will compare it to my experience and my knowledge of design, what design processes should be gone through, the laws of physics, common sense if you please, and I will compare it to that and come to my conclusion which I have stated."

The testimony of appellee's expert witness reflected in the transcript is:

"In my opinion general engineering principles and practices are applicable to the design of lawnmowers. This lawnmower conforms to generally accepted engineering principles and practices."

■ It is apparent there was a conflict in the opinion of the experts who had been qualified and were accepted by the trial court.[1] It was proper for the jury to choose which expert it believed. Instruction No. 7 submitted this question to them and they clearly indicated their confidence in the opinion of appellant's expert.[2]

The record reflects that the standards of the American Standards Association, Inc., pertaining to lawn mowers were admitted into evidence in connection with the testimony of appellant's expert witness. The appellee and the trial court, upon second thought, feel these standards should not have been admitted. The basis for their admission during the trial was the learned treatise exception to the

1. "* * * the qualification of the witnesses to testify as experts and the weight to be given to their testimony were matters peculiarly for the trial court." Bratt v. Western Airlines, 155 F.2d 850, 853 (10 Cir. 1946).

2. "* * * the weight and credibility of their testimony was essentially a matter to be decided by the trier of the ultimate fact." Equity Oil Co. v. National Fire Ins. Co. of Hartford, 247 F.2d 393, 395 (10 Cir. 1957).

hearsay rule contained in the Kansas Statutes.[3]

The court at that time instructed the jury:

"Now, as the Court will instruct you, ladies and gentlemen of the jury, when a matter is stipulated to by counsel, it is to be taken as true by the jury. I want to point out that the defendant does not stipulate to the materiality or the relevancy of these standards. I would point out further that these standards are not an indication of industry practice, and the standards are admitted only for what they are worth as evidentiary value in line with my statements of what is admitted and what is not admitted. They are admitted only for the use, the purpose of the use of this expert who is testifying at this time and must be taken in consideration with his testimony and thus under the stipulations, under my admonition and my statements to you as to what these standards may be used for, they will be admitted."

Subsequently, on cross-examination, the expert testifying for the appellee said:

"As an engineer I am familiar with the American Standards Safety Specifications generally. It is a non-profit organization which was started many years ago largely at the instance of engineering societies in order to set up standards of efficiency, performance and safety, for various machines which are sold to the public. They cover a wide variety of industries and type of machinery. They haven't the force of law. But they are standards which I as an engineer and others in my field have the need to be acquainted with. They serve a very valuable purpose. I have seen their latest catalog which covers hundreds of different items. In order to acquaint myself with a subject or with standards, I have to go to material like this to find what the standards are when I have to examine any particular machine which is covered by them. When it comes to figures and formulas and charts, and so forth, engineers have to make very wide use of texts and manuals, journals and standards of this sort.

We could not operate if we had to go out and make a test for everything ourselves. I go to the standards to see what they are, what standards have been established. They have a useful purpose in my business. * * *"

The standards being discussed were distributed in October, 1960, and were standards pertaining to power lawn mowers. The appellee had actual knowledge of the specifications in January, 1961. The machine involved was purchased on April 25, 1961.

An examination of Mathew's testimony,[4] indicates to us that he was using the language in the treatise as one means of substantiating his own professional opinion. This being so, it becomes unnecessary to consider whether the American Standards Association treatise created the standard by which defective or negligent design was measured. Mathew's professional opinion was the critical testimony, and the standards were no more critical than Mathew's other training, experience or expertise. Examination of the entire record discloses that the jury's determination based upon the acceptance of the testimony of expert Mathews is a logical conclusion.

Therefore, the trial court did not err when it admitted into evidence for a limited purpose the standards contained in the American Standards Association treatise.

Appellee contends and the court below concluded that under the Kansas law liability was not established because the appellee could not have known or foreseen the particular injury suffered by the appellant herein. The court cites and relies upon Cleghorn v. Thompson, 62 Kan. 727, 64 P. 605, 54 L.R.A. 402.

3. 4 Kansas Stat.Ann. § 60–460(cc) (1964).

4. Appellant's expert.

However, since that case, the Supreme Court of Kansas has said:

"Where an act is negligent, it is not necessary, to render it the proximate cause, that the person committing it could or might have foreseen the particular consequence or precise form of the injury, or the particular manner in which it occurred, if by the exercise of reasonable care it might have been foreseen or anticipated that some injury might result." Atherton v. Goodwin, 163 Kan. 22, 180 P.2d 296, 300 (1947); Crow v. Colson, 123 Kan. 702, 256 P. 971, 972, 53 A.L.R. 457.

"If there is some probability of harm sufficiently serious that ordinary men would take precautions to avoid it, then failure to take such care is negligence. It is not a necessary element of negligence that one charged with it should have been able to anticipate the precise injury sustained." Rowell v. City of Wichita, 162 Kan. 294, 176 P.2d 590, 595 (1947).

" * * * [I]t is generally held, regardless of whether the question of 'foreseeability' is treated as a problem of 'duty,' 'negligence,' or 'proximate cause,' that it is not necessary that the defendant might or should have foreseen the likelihood of the particular injury or harm, the extent of the harm, or the manner in which it occurred, but that it is only necessary that he should have anticipated that some injury or harm might result from his conduct." 100 A.L.R.2d 980; Rowell v. City of Wichita, 162 Kan. 294, 176 P.2d 590 (1947) and Atherton v. Goodwin, 163 Kan. 22, 180 P.2d 296 (1947) cited as authority.

██ Under the above cited cases, Instruction No. 7 directly submitted to the jury: "Could defendant have reasonably foreseen or anticipated consequent bodily harm to a person such as plaintiff being a person expected to be in the vicinity of probable use of said power mower?" The jury answered this and all other questions bearing on negligence, foreseeability and proximate cause in the affirmative. We are of the opinion that the matter was properly submitted to the jury under the rule set out in Kansas, "that the question of proximate cause and extent of appellee's damage is a question for the jury or other trier of fact." Atherton v. Goodwin, supra. See also Flaharty v. Reed, 167 Kan. 319, 205 P.2d 905 (Kan. 1949).

The trial court instructed the jury that appellee's liability was to be determined as though it were the manufacturer of the lawn mower.[5] Appellee objects to this instruction.

It is not disputed that a wholly owned subsidiary manufactured the part which was defective and assembled the power mower exclusively for appellee. It is also not disputed that the appellee's retail operation exclusively distributed the mower under a tradename, exclusively owned and advertised by it.

"Unquestionably, taking into consideration today's national distribution of goods, the products liability cases represent an area in which the corporate veil should be pierced to fasten upon the defendant his true duty and liability." 2 Frumer-Friedman, Products Liability 454, § 18.01(2) (1966).

The Sixth Circuit has said:

"As a general rule, a vendor who acquires for resale a product in the open market from a responsible manufacturer is not liable for its negligent manufacture absent such vendor's knowing, or having reason to know, of the dangerous character of the product which he sells * * *

When the rule is applied, a retailer or distributor is protected because of his having purchased in the open market a product made and sometimes packaged by another, and because under

---

5. "You are instructed that, as a matter of law, the liability of defendant, if any, is to be determined as though it were the manufacturer of the power mower involved herein."

such circumstances he has the right to assume that the product is not dangerous to the intended users thereof. * * * Manufacturing is not an end in itself. The process contemplates that the goods produced will be sold to consumers. * * * We do not think that one department of a manufacturing and selling enterprise which puts a dangerous product into the channels of trade can escape liability by saying that it did not know what another department of such an integrated operation was doing. * * * The reasons for the rule protecting a retailer or distributor from liability for negligence under certain circumstances thus do not exist in this case." Bathory v. Procter & Gamble Distributing Company, 306 F.2d 22, 28–29 (1962).

Prior to this case, the trial judge had said:

"At the outset, it should be noted that the separate entities of parent and subsidiary bodies corporate are usually entitled to be so treated. See, e. g., Austad v. United States Steel Corp., supra [D.C., 141 F.Supp. 437]. But at the same time it must be recognized that where the facts warrant, it is within the court's power to pierce the corporate veil. [Citations omitted]." Fooshee v. Interstate Vending Company, 234 F.Supp. 44, 48 (D.Kan. 1964).

 The court's conclusion that the facts warranted piercing the corporate veil in this case was a reasonable one and is sustained by the evidence. It will not be disturbed.

The judgment on the verdict as remitted should be restored.

 The trial court made a conditional ruling on defendant's alternative motion for a new trial denying the motion. We will not disturb the ruling because "[t]here was no abuse of discretion in the denial of this motion." American Smelting & Refining Co. v. Sutyak, 175 F.2d 123 (10 Cir. 1949); Viles v.

Prudential Insurance Co., 107 F.2d 696 (10 Cir. 1939); Zahn v. Hudspeth, 102 F.2d 759 (10 Cir. 1939).

"The special suitability of having a trial judge decide the issue of a new trial in cases like this is emphasized by a long and unbroken line of decisions of this Court holding that the exercise of discretion by trial judges in granting or refusing new trials on factual grounds is practically unreviewable by appellate courts. See, e. g., Fairmont Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 481–482 [53 S.Ct. 252, 77 L.Ed. 439]; cited with approval in Montgomery Ward & Co. v. Duncan, supra [311 U.S. 243] at 253, n. 12, [61 S.Ct. 189, 85 L.Ed. 147]." [6]

The judgment is reversed and the case is remanded with directions to enter a judgment consistent herewith.

---

6. Neely v. Martin K. Eby Construction Co., 386 U.S. 317, 87 S.Ct. 1072, 1081, 1084, 18 L.Ed.2d 75 (U.S. March 20, 1967) (Black, J., dissenting).