NATIONAL LIVESTOCK CREDIT
CORPORATION, a corporation,
Appellant,

v.

G.W. SCHULTZ; Schultz Cattle Co., a limited partnership; Iowa Beef Processors, Inc., a corporation; and Wilson and Co., a corporation, Appellees.

No. 55790.

Court of Appeals of Oklahoma,
Division 2.

July 27, 1982.

Rehearing Denied Sept. 28, 1982.

Certiorari Denied Nov. 15, 1982.

Released for Publication by Order of the Court of Appeals Nov. 19, 1982.

Granville Tomerlin, Tomerlin, High & High, Oklahoma City, for appellant.

Harry H. Selph, II, Fellers, Snider, Blankenship, Bailey & Tippens, P.C., Oklahoma City, James T. Malysiak, Edward W. Rothe, Freeman, Rothe, Freeman & Salzman, P.C., Chicago, Ill., for appellees Iowa Beef Processors and Wilson and Co.

BRIGHTMIRE, Judge.

The major question raised by this appeal is whether the terms of a cattle security agreement regarding sale of the cattle, designed for perfected lender's protection, were waived by the creditor's long-term course of conduct inconsistent with the protective provisions. A secondary issue is whether a secured party is estopped to deny authorization of the sale in a suit for conversion against the buyer based upon a detrimental reliance theory. The trial court resolved both issues against the loan company. We affirm.

I

The facts are not disputed. G.W. "Bill" Schultz and his son were the general and

limited partners of Schultz Cattle Co., that ran and grazed cattle until 1973 when it began a so-called "fat cattle" operation.[1] Beginning in April 1964, Schultz Cattle Co. financed its operation with funds from loans obtained through National Livestock Credit Corporation. The financial arrangement was such that in April 1964 a note was executed in excess of $400,000 payable to National in one year. In each of the succeeding years a new note was executed representing the carry over indebtedness of the cattle company from the preceding year's operations. The last such note, and the one that forms the basis of the present suit, was executed on July 27, 1973, in the principal sum of $586,639.02, payable on July 1, 1974. G.W. Schultz signed the note as co-maker with Schultz Cattle Co. and both executed a security agreement to National giving it a security interest in the herd, including after-acquired cattle and proceeds. Also executed was a loan agreement that, among other things, allowed Schultz to draw whatever money he needed over the course of the year to operate his business. Through this type of arrangement there would be no need for Schultz to retain any portion of the proceeds received from sales of cattle to meet business expenses.

The security agreement also provided: "The Debtor will care for and maintain the crops and property herein described in a good and husbandlike manner and will not further encumber, conceal, remove or otherwise dispose of the same without the written consent of the Secured Party; however, permission is granted for the Debtor to sell the property described herein for the fair market value thereof, providing that payment for the same is made jointly to the Debtor and to the Secured Party . . . ."

The loan agreement contained no conditional consent provision, but did say that "Bor-rower agrees to remit all funds from sale of secured property directly to National" to apply toward the indebtedness.

Between 1973 and 1974, Schultz sold portions of the collateral cattle to various packers without the prior written consent or knowledge of National. In every instance, the check was made payable to Schultz Cattle Co. only. Schultz, in turn, either mailed the check to National or deposited the packer's check into the Cattle Co.'s account and then issued a new check to National to pay off the note indebtedness. National concedes that it never rebuked Schultz for ignoring the terms of the security agreement relating to sales of secured cattle. As a matter of fact, it admits this procedure was customarily followed by all its loan account clients and by the industry as a whole.

In 1974 and 1975, Schultz, along with the entire cattle industry, began experiencing severe financial problems. By a letter dated April 19, 1974, National's then manager, Harley Custer, informed Schultz that several loans would have to be "shaken down fairly well," including the Schultz Cattle Co. loan and that this loan would be discussed at the next board meeting. On June 20, 1974, Custer again wrote Schultz saying there would be no renewal of the loan, due July 1, 1974, because National's bank would approve no more loans and National could not carry the loan unless it were discounted. Custer told Schultz that the loan could be extended an additional 60 to 90 days if Schultz could reduce the loan amount by $200,000. National, however, agreed to a plan by Schultz to liquidate the herd as "fat cattle" over a period of several months instead of immediately selling the cattle as feeders—the expectation was that this plan would increase the value of the herd by $100,000.

It was anticipated, said Custer, that under this program cattle would be sold out of the feedlot to a packer buyer beginning in

1. That is, cattle were raised and fed at a feedlot and sold for slaughter at a higher rate of re-turn.

September 1974 and that National was leaving it solely up to Schultz to decide to whom he would sell the cattle. And, according to Custer, the procedure for handling the proceeds of the sales was to be the same as it had been in the past, *i.e.,* packer would send check to Schultz Cattle Co. in its or Schultz' name and then the cattle company would forward the check to National.

Schultz could not sell the cattle during the fall of 1974 and this spawned weekly calls from Custer to Schultz expressing the lender's concern that no sales had been made. "We had fulfilled our part of the plan in advancing this money [additional money for feed, and extending the note's due date]," he once said, "and we did want him to get to selling these cattle . . . ."

Eventually, some sales were made to a small processing plant owned by Schultz (Schultz Farms), and the proceeds of these sales were remitted to National in the usual manner. On January 5, 1975, Wilson and Company bought 34 steers and 42 heifers from Schultz on a grade and yield basis[2] for a total fair market value of $29,089. Wilson acquired 42 more heifers on January 6 for which it paid a grade and yield price of $14,609. On January 8, Schultz sold 140 heifers to Iowa Beef Processors (IBP) for $50,330.24 and on January 19 sold another 148 head to IBP for $51,121.73. With the exception of the last draft paid by IBP,[3] all of the checks were made payable to Schultz Cattle Co. or Schultz Industries, as directed by Schultz. The proceeds, however, were not transmitted to National, but rather to some of Schultz' feed suppliers.

Upon learning of the sales and Schultz' application of the proceeds to grain bills, National liquidated the remaining herd and otherwise attempted to salvage what it could to reduce the loan balance. National also made demand of Wilson and IBP for payment, which demand, of course, was refused. Schultz, in the meantime, had filed bankruptcy. On March 3, 1976, National filed this action against Wilson and IBP[4] claiming the unauthorized sales to them were in derogation of its security interest and filed financing statements and constituted conversion.

Defendants in their answer admitted the respective purchases of cattle and that they rejected National's demand for the purchase price, but denied they had converted the cattle. IBP also raised the affirmative defenses of waiver and estoppel. Wilson alleged, among other things, "that a pattern and practice of dealing was developed over many years whereby [National] allowed . . . Schultz . . . to keep possession of all [secured] cattle," sell them without National's knowledge or consent and remit the proceeds of the sale to National; therefore, National waived the consent terms in the security agreement, relinquished its security interest in the cattle and is estopped to assert any claim against Wilson. Both defendant buyers specifically asked for reasonable attorney's fees.

Cross-motions for summary judgment were filed by plaintiff and defendants. By letter order dated July 10, 1980, the trial court granted summary judgment in favor of the defendants after finding that National waived the sale restriction terms of the security agreement through a "course of performance" that allowed Schultz to remit only the proceeds of such sales to National. "Thus," the court said, "National authorized Schultz to sell the cattle to IBP and Wilson without restriction and they

---

2. The sales price for cattle bought on a grade and yield basis as opposed to live weight basis is not determined until after the cattle are slaughtered.

3. At this point in time, National had learned of the sales and Schultz' failure to pay it the proceeds. National instructed IBP to make the last check jointly payable to Schultz Cattle Co. and National, and IBP complied.

4. National also sued Schultz and Schultz Cattle Co. for default and conversion. The debtors, however, never answered and are not parties to this appeal.

took title free and clear of National's security interest." Moreover, the court concluded, National was estopped to demand literal compliance with the payment provisions of its security agreement on a detrimental reliance theory on the authority of *Poteau State Bank v. Denwalt,* Okl., 597 P.2d 756 (1979). Finally, the trial judge denied the defendants' prayer for attorney's fees upon the theory that 12 O.S.1979 Supp. § 940(A) does not apply to conversion of property causes of action.

National timely filed its petition in error challenging the judgment. The defendants cross-appealed with regard to the trial court's refusal to assess attorney's fees pursuant to 12 O.S.1979 Supp. § 940(A) and 42 O.S.1981 § 176.

## II

The arguments raised by National in its voluminous brief boil down to this: only the provisions of general Article One of the Uniform Commercial Code and of secured transactions Article Nine govern security agreements, and therefore, the trial court erred in finding that the course of performance and waiver provisions of Article Two can be invoked to undermine express terms of a security agreement. It further argues there were no transactions between National and defendant packing companies that could act to estop National from asserting its security interest in the cattle.

Since we affirm the trial court's order as to the waiver issue, it becomes unnecessary to address the detrimental reliance theory.

National concedes, as it must, that the uniform code expressly provides that its provisions shall be supplemented by principles of law and equity unless these principles have been displaced by particular provisions of the act. 12A O.S.1981 § 1–103. The code, too, explicitly provides that it is

to be liberally construed and applied to promote its underlying purposes and policies, one of which is "to permit the continued expansion of commercial practices through custom, usage and *agreement of the parties.*" 12A O.S.1981 § 1–102(1) & (2)(b) (emphasis added).

The principal code provision having application to the present appeal is 12A O.S.1981 § 9–306, which provides in part:

"(2) Except where this Article otherwise provides, a security interest continues in collateral, notwithstanding sale, exchange or other disposition thereof, *unless the disposition was authorized by the secured party in the security agreement or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor." (emphasis added)

Clearly, the statute continues the secured party's security interest both in the collateral in the hands of a buyer as well as the proceeds received by the borrower from the unauthorized sale of the collateral. The security interest can be lost, however, and is lost if the sale is authorized by the secured party in the "security agreement or otherwise."

The trial court found the undisputed facts to be that National's prior conduct and its actions in regard to the sales at issue here constituted a waiver of its contractual rights. While National does not deny the facts are undisputed, it does disagree with the court's conclusion on the ground that the doctrine of waiver cannot be applied to a U.C.C. security agreement. More specifically National contends that the court impermissibly applied an Article Two concept to an Article Nine transaction, and in advancing this thesis it assumes that the only statutory basis for the decision is 12A O.S.1981 § 2–208.[5]

We think National misapprehends the basis of the trial court's decision and the ef-

---

**5.** This section, entitled "Course of Performance or Practical Construction," provides:

"(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the

performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

fect the separate articles of the uniform code have on one another as well as the effect supplemental principles of law and equity have on commercial transactions. Another provision in Article One, which is applicable to all sections of the code, amply supports the trial court's legal conclusions.

As at least one court has quite correctly pointed out, the definitions in Article One (12A O.S.1981 § 1–201) are automatically made a part of each article in the code and thus a "security agreement" must first be an "agreement" as defined in § 1–201.[6] And, since an agreement is defined by the code as "the bargain of the parties in fact as found in their language or by implication from other circumstances including ... course of performance as provided in this Act (Section ... 2–208)," this has to include security agreements. Therefore, a certain course of performance can result in the waiver of an express term in a security agreement.

There is yet another U.C.C. basis for the invocation of the waiver theory. Section 9–306(2) contemplates extinguishment of a security interest if disposition of collateral is authorized by a secured party "in the security agreement *or otherwise.*" The italicized language cannot be considered as mere surplusage and, in fact, the connective "or" gives it at least as much substantive value as the express terms of a security agreement. National's course of conduct certainly has to be considered as an "otherwise" authorization of the sale that resulted in defendant purchasers taking the cattle free from National's security interest.

Finally, apart from the interconnections among the various articles and sections of the code, the previously mentioned §§ 1–103 and 1–102—which allow for supplementation of the code with principles of law and equity in determining rights of the parties—require the court to look not only at the words used by the parties but to analyze their conduct as well in determining what agreement they actually made and what the equities should be.[7] Certainly the facts of this case lend themselves to the application of one time honored maxim of equity: "Where one of two innocent persons must suffer by the act of a third, he who has enabled such third person to occasion the loss must suffer." *Pettis v. Johnston,* 78 Okl. 277, 190 P. 681 (1920).

Assuming National is an innocent party, it made no effort to alter the customary financial practices of prosperous times after the cattle business turned sour. This "business as usual" attitude made it possible for Schultz to misapply the funds in question and, therefore, from an equitable standpoint National should bear the loss.

### III

█ Wilson and IBP cross-appeal from the order of the trial court denying an

---

(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (Section 1–205).

"(3) Subject to the provisions of the next section [2–209] on modification and waiver, *such course of performance shall be relevant to show a waiver* or modification *of any term inconsistent with such course of performance.*" (emphasis added)

**6.** *Westinghouse Credit Corp. v. Shelton,* 645 F.2d 869 (10th Cir.1981). This case involved an installment note contract and the course of

performance/waiver provisions of 12A O.S. 1981 § 2–208 as that statute relates to "anti-waiver" terms of a contract. The court's observation of the impact of course of performance on a security agreement is dictum.

**7.** *Cf. Poteau State Bank v. Denwalt,* Okl., 597 P.2d 756 (1979). Although this decision also rests on estoppel principles, *Denwalt* is enlightening in the present context for its finding that authorization to sell pursuant to § 9–306(2) can be implied from the conduct of the secured party. The holding reveals a preference for deciding issues based on the parties' conduct as to the particular sale of collateral as opposed to looking only at the words used in a security agreement.

award of attorney's fees to them as prevailing parties under 12 O.S.1981 § 940(A).[8] The basis of the trial court's ruling is that § 940(A) is restricted to actions seeking damages for the physical destruction of tangible property. Defendants allege error in this interpretation of § 940(A) and insist that it reaches actions, such as the present one, for the alleged interference with an interest in property.

We think the trial court's interpretation of § 940(A) is correct. The gist of conversion is unauthorized dominion over property[9] rather than a negligent or willful injury although it might involve the latter. Here the thrust of National's complaint is not that the defendants injured the cattle, but that in ignoring National's security interest in the cattle, defendants exercised unauthorized dominion over them—a tort not contemplated by § 940(A).

Defendants say the provisions of 42 O.S. 1981 § 176 also permit them to recover attorney's fees from National. Again they are mistaken. Section 176 pertains to "an action brought to enforce any lien." As we have already mentioned, National's cause is a tort action for conversion damages—not one to enforce a lien.

We hold the trial court properly denied the award of attorney's fees.

Affirmed.

BACON, J., concurs.

BOYDSTON, P.J., not participating.

---

8. That statute provides in part:

"A. In any civil action to recover damages for the negligent or willful injury to property ..., the prevailing party shall be allowed reasonable attorney's fees...."

9. *Griffith v. McBride,* 188 Okl. 227, 108 P.2d 109 (1941); *White v. Webber-Workman Co.,* Okl.App., 591 P.2d 348 (1979).