**J.I. CASE CREDIT CORPORATION,**
**Plaintiff–Appellee,**

v.

**Bobby CRITES, Defendant,**

**and**

**Rodney Timm, Defendant–Appellant.**

**No. 85–2931.**

United States Court of Appeals,
Tenth Circuit.

July 1, 1988.

---

Jay Williams (Kenneth I. Jones, Jr., on the brief), Eagleton, Nicholson, Jones, Blaney & Pringle, Oklahoma City, Okl., for plaintiff-appellee.

James Craig Dodd (Mary Helm, with him on the briefs), Dodd & Helm, Enid, Okl., for defendant-appellant.

Before MOORE, ANDERSON, and TACHA, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

Rodney Timm appeals from a judgment of the District Court for the Western District of Oklahoma awarding immediate and permanent possession of a Case tractor to the J.I. Case Credit Corporation. We affirm.

## I.

On September 22, 1981, Bobby Crites purchased a new Case tractor from Jensen's, Inc., a farm equipment dealer in Fairview, Oklahoma. Crites executed a re-

tail installment contract and security agreement for the purchase of the tractor. The contract and security agreement were assigned to J.I. Case Credit Corp. ("Case"), and Case properly filed a financing statement covering the tractor. The security agreement prohibited Crites from selling or transferring the tractor without the consent of the seller. As a result of the assignment, the authority to consent to a sale of the collateral was transferred to Case.

In June, 1982, Crites offered the tractor for sale at a public auction. Rodney Timm, the appellant here, bid on the tractor, but his bid was not accepted. Shortly after the auction, however, Timm purchased the tractor from Crites for $35,000.00 cash. After the sale, Timm had some repair work and some warranty work done by Jensen's. Although Jensen's knew that Timm was in possession of the tractor, there is a dispute over whether Jensen's knew that Crites had sold the tractor to Timm. Case became involved when the $10,000.00 payment due from Crites on October 1, 1983 was not received. In December, 1983, Case accepted a partial payment of $2,000.00 and executed an extension agreement with Crites for the remaining balance on the tractor. Gary Murdock, the credit representative for Case, testified that he was not aware of the sale to Timm when the extension agreement was signed. Murdock testified that he first learned of the sale in April 1984, after Crites had missed the next scheduled payment under the extension agreement. In August 1984 Case filed a complaint seeking to replevy the tractor from Timm.[1] Shortly after the complaint was filed Crites filed bankruptcy, thereby staying further proceedings against him.

On November 21, 1985, following a one-day trial to a jury, the district court directed a verdict for Case, holding that, as a matter of law, Case had established a valid security interest in the tractor and Timm had failed to submit sufficient evidence to support his claimed affirmative defenses.

## II.

The standard of review in assessing whether a trial court properly directed a verdict is essentially the same standard applied by the trial court in passing on the directed verdict motion, i.e. whether the evidence is sufficient to create an issue for the jury. *Motive Parts Warehouse v. Facet Enterprises,* 774 F.2d 380, 385 (10th Cir.1985) (citing *Swearngin v. Sears Roebuck & Co.,* 376 F.2d 637, 639 (10th Cir. 1967)); *see also Black v. Hieb's Enterprises, Inc.,* 805 F.2d 360, 364 (10th Cir.1986). "In a diversity case, federal courts are bound by Rule 50, Fed.R.Civ.P., in granting a directed verdict. Under the federal standard, 'a directed verdict is justified "only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." ' " *McKinney v. Gannett Co., Inc.,* 817 F.2d 659, 663 (10th Cir.1987) (quoting *Kiner v. Northcutt,* 424 F.2d 222, 223 (10th Cir.1970) (quoting *Fischer Construction Co. v. Fireman's Fund Ins. Co.,* 420 F.2d 271, 275 (10th Cir.1969))); *see also Motive Parts,* 774 F.2d at 386. In other words, "the trial judge may grant a motion for directed verdict only when all the inferences to be drawn from the evidence are so in favor of the moving party that reasonable persons could not differ in their conclusions." *Federal Deposit Ins. Corp. v. Palermo,* 815 F.2d 1329, 1335 (10th Cir.1987) (citing *Hidalgo Properties, Inc. v. Wachovia Mortgage Co.,* 617 F.2d 196, 198 (10th Cir.1980)); *see also McKinney,* 817 F.2d at 663 ("If reasonable men could differ as to the inferences drawn from facts in evidence, a motion for a directed verdict should be denied.")

With these principles in mind, we review the trial court's decision. Under Oklahoma law, a secured party normally retains a security interest in collateral following the sale or transfer of that property. Okla. Stat.Ann. tit. 12A, § 9–306(2) provides:

"Except where this article otherwise provides, a security interest continues in collateral, notwithstanding sale, exchange or other disposition thereof, unless the

---

**1.** There were other claims and counterclaims which are not relevant to this appeal.

disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

*See also* 9 Anderson, *Uniform Commercial Code,* § 9–306:6 (1985) ("When a sale or any other disposition is made of the collateral without consent or authorization by the secured party, the right of the secured person in the collateral continues despite the sale or disposition."). No transfer was authorized in the security agreement; in fact, the security agreement prohibited sale or transfer of the collateral. In Oklahoma, however, authorization for the sale of collateral may be found in the secured party's conduct or actions. Under certain circumstances, the secured party may ratify a prior sale or waive the interest in the collateral. "Section 9–306(2) contemplates extinguishment of a security interest if disposition of collateral is authorized by a secured party 'in the secured agreement *or otherwise.*' The italicized language cannot be considered as mere surplusage and, in fact, the connective 'or' gives it at least as much substantive value as the express terms of a security agreement." *Nat'l Livestock Credit Corp. v. Schultz,* 653 P.2d 1243, 1247 (Okla.App.1982) (emphasis in original).[2] This court addressed the same question in *First Nat'l Bank v. Iowa Beef Processors,* 626 F.2d 764, 766 (10th Cir.1980):

"Section 9–306(2) authorization can be given 'in the security agreement or otherwise.' The security agreement here contained no reference to sales and therefore, of course, gave no authorization for sales. Thus, we must look elsewhere for authorization. Under Oklahoma law, authorization to sell collateral can be both express and implied. *See Poteau State Bank v. Denwalt,* 597 P.2d 756, 760 (Okla.1979)."

*See also* 9 Anderson, *Uniform Commercial Code* § 9–306:8 (1985).

Timm's defense was that Case, through its conduct, had impliedly authorized the sale of the tractor through ratification, waiver or estoppel and had therefore lost any security interest in the tractor. Specifically, Timm argued that Jensen's was Case's agent for the purpose of collecting Crites' payments for the tractor; that Jensen's learned of the sale and that knowledge was imputed to Case (or, alternatively, that Case had actual knowledge of the sale); and that the negotiation and execution of the extension agreement constituted an authorization of the sale of the tractor, thereby cutting off Case's security interest. Each of these questions is normally an issue of fact. *See Poteau State Bank v. Denwalt,* 597 P.2d 756, 760 (Okla.1979) ("What act is sufficient to constitute an implied authorization to sell collateral under § 9–306(2) is an issue of fact.").

Our review of the record demonstrates factual disputes on three issues: (1) whether Jensen's was Case's agent for purposes of collection; (2) whether Jensen's had knowledge of the sale of the tractor prior to the extension agreement; and (3) whether Case had actual knowledge of the sale prior to the extension agreement. However, even were we to assume that Case had actual or constructive knowledge that the tractor had been sold to Timm prior to the execution of the extension agreement

---

**2.** There is a split among the states as to whether the express terms of a security agreement may be altered through a course of dealing.

"The most hotly disputed question regarding authorization under UCC § 9–306(2) involves the question of whether, where a security agreement prohibits transfer of collateral without the written consent of the secured party, such a transfer may be authorized by a prior course of dealing between the parties or a known usage of trade in the area. Some jurisdictions hold that a course of dealing or useage [sic] of trade may be sufficient to constitute authorization of a transfer, while others hold that a course of dealing does not constitute authorization under the statute, either for the particular sale at issue or in general."

Annotation, *What Constitutes Secured Party's Authorization to Transfer Collateral Free of Lien Under UCC § 9–306(2),* 37 A.L.R. 4th 787, 792–93 (1985). Oklahoma, obviously, follows the first course. *See also Moffat County State Bank v. Producers Livestock Marketing Assoc.,* 598 F.Supp. 1562, 1568–70 (D.Colo.1984) (discussing the two lines of cases), *aff'd,* 833 F.2d 908 (10th Cir.1987).

with Crites, we can find nothing in the record to support Timm's assertion that Case impliedly authorized the sale of the tractor. For that reason, we affirm the directed verdict in favor of Case.

Timm advanced three separate, but related, theories to support an implied authorization of the sale by Case: ratification, waiver and estoppel.[3] Although some of the analysis will be repetitive, we will review each in turn.

■ Initially, we note that "[s]ince § 9–306(2) does not require a secured party to take any action to preserve his security interest, *inaction alone may not lead to a finding of an implied authorization.*" *Poteau,* 597 P.2d at 761 (emphasis added). Thus, without more, the fact that Case took no action to recover the tractor until August, 1984 is not an implied authorization of the sale. Because Case committed only one relevant act—the execution of the extension agreement with Crites—the focus of our analysis is clear: Assuming that Case had actual or constructive knowledge that Crites sold the tractor to Timm, did the execution of an extension agreement constitute an implied authorization of the sale?

■ First, the extension agreement alone cannot be construed as a ratification of the prior sale. Under Oklahoma law, "[r]atification requires intent to ratify plus full knowledge of all material facts." *Eustler v. First Nat'l Bank,* 639 P.2d 1245, 1247 (Okla.1982) (citing 2 Anderson, *Uniform Commercial Code,* § 3–404:7 (1971); Restatement (Second) of Agency (1958)). The Oklahoma court has adopted the same requirement in connection with § 9–306(2). "A secured party will have impliedly authorized a sale of his collateral when, from the circumstances, general language and conduct of the parties, it is found that he

*intended* to authorize the sale." *Poteau State Bank,* 597 P.2d at 760 (emphasis added). There is no suggestion in the trial testimony or record that Case *intended* to ratify the prior sale and free the tractor from its security interest. To the contrary, the extension agreement signed by Crites provided that "[e]xcept for the modifications as above stated [related to the time and amount of outstanding payments], the terms and conditions of the original Security Agreement shall remain in force and effect and are hereby affirmed."[4] R.Vol. I, at tab 1, ex. C. Moreover, it would be unrealistic for this court, or the trial court below, to assume that the requisite intent can be found merely in the execution of the extension agreement. At the time of the agreement, the unpaid balance on the tractor was over $18,000 and Crites was obviously in financial difficulty. An extension of the payment deadlines was a reasonable action for the creditor to take, and it is consistent with a continued security interest in the tractor. We can find no evidence that Case intended to forego the security interest in the collateral and look only to Crites for payment.

■ Timm also suggests that the fact that Case claimed a right to any proceeds from the collateral on the financing statement and accepted a portion of the proceeds from the sale (the payments from Crites) supports an inference of ratification or waiver. Timm quotes from the official comment to UCC § 9–306(2):

"A claim to proceeds in a filed financing statement might be considered as impliedly authorizing sale or other disposition of collateral, depending upon the circumstances of the parties, the nature of the collateral, the course of dealing of the parties and the usage of the trade."

That revision agreement ... merely amended the payments and provided for added charges. That agreement was no showing of intent to transfer free and clear of the security interest—in fact it was to the contrary and expressly provided that, except for modifications therein, the original agreement was to remain unchanged.").

---

**3.** Timm's brief on appeal also refers to defense of laches, but the argument is not developed either at trial or on appeal, nor do we find any evidence to support the argument.

**4.** *Cf., e.g., Central California Equipment v. Dolk Tractor Co.,* 144 Cal.Rptr. 367, 371 (Cal.Ct.App. 1978) ("Appellants reliance on the revision agreement to show authorization is misplaced.

*See* Okla.Stat.Ann. tit. 12A, § 9–306, UCC Comment 3.

We read this comment as saying little more than that a claim to proceeds is one factor to consider in determining whether the secured party has impliedly authorized the sale of collateral. Certainly it is not dispositive. "The fact that the security agreement covers proceeds is not in itself an authorization to sell the collateral and therefore does not constitute a waiver of an express prohibition against sale." 9 Anderson, *Uniform Commercial Code*, § 9–306:8 (1985). We find nothing in these circumstances or the dealings of these parties to suggest an authorization of the sale.

> "Conduct which does not mislead anyone does not constitute a waiver. The fact that the creditor accepts the proceeds of an unauthorized sale of the collateral and fails to complain that the sale was improper does not constitute a waiver of the creditor's security interest in the collateral."

*Id.* (footnotes omitted).

■ Nor can the extension agreement be read as a waiver of the security interest. Once again, we turn to Oklahoma law and find that "[w]aiver is the intentional relinquishment of a known right or conduct which warrants an inference of such intent ..." *Crowell v. Thoreau Center, Partnership*, 631 P.2d 751, 752 (Okla.1981) (citation omitted); *see also Archer v. Wedderien*, 446 P.2d 43, 45 (Okla.1968). The court in *Crowell* also stated that waiver becomes a question of fact for the jury "where it is properly pled and there is evidence to support the plea ..." *Crowell*, 631 P.2d at 752. In this case, as noted earlier, we find no evidence to support Timm's waiver argument. To find that Case waived the security interest in the tractor, there must

be evidence that Case intended to abandon that right. All of the evidence in the record points the other way, that Case intended to retain the security interest in the tractor, while at the same time giving Crites more time to pay the remaining balance.

■ Similarly, we find no evidence supporting Timm's claim of estoppel against Case. The Oklahoma Supreme Court has held that a secured party may be estopped from asserting an interest in collateral, but the party advancing the estoppel defense must have *detrimentally relied* on the words or conduct of the secured party. *Poteau State Bank*, 597 P.2d at 759.[5] The district court, in granting Case's motion for a directed verdict, found no evidence of detrimental reliance by Timm. We agree. Timm relied on Crites' representation that any problems with Case would be "worked out"; he did not rely on the extension agreement. Timm did not alter his position based on the action or inaction of Case i.e., he did not rely on either the extension agreement or Case's failure to immediately repossess the tractor when Crites missed the first payment. Timm simply continued to use the tractor and relied on *Crites'* representations that there were no financial problems. Arguably, the effect on Timm was beneficial. The alternative to the extension agreement was an immediate action to replevy the tractor, meaning that Timm would have lost the use of the tractor even earlier. *See* R.Vol. II at 109–17. Without detrimental reliance by Timm, Case cannot be estopped from asserting its security interest.

We conclude that Timm was unable to advance sufficient evidence of ratification, waiver or estoppel to reach the jury. That conclusion is reinforced by our evaluation

---

5. The language of *Poteau State Bank* is instructive:

> "Under certain conditions, words or conduct of a party may operate to estop him from exacting literal compliance with contract terms. If a party represents or leads one to believe that he will not insist upon literal performance of a contract term, and the other party detrimentally relies thereon, the first party will be held estopped from demanding literal compliance...."

> "We must hence inquire here whether Denwalt represented to Haskins, by words or conduct, that she would not require it to obtain her prior written consent to sell the collateral, and if so, whether Haskins detrimentally relied upon such representation."

*Poteau State Bank*, 597 P.2d at 759 (footnote omitted). The court proceeded to find detrimental reliance and estoppel in those circumstances.

of the prior cases finding an implied authorization to sell collateral under Oklahoma law. A brief review of these decisions demonstrates that the circumstances and the course of dealing between the parties is significantly different than those encountered here.

In *Poteau State Bank*, Denwalt claimed a security interest in certain equipment. However, acting in a corporate capacity, Denwalt had previously conveyed the equipment by bill of sale and covenanted it to be free of all encumbrances. The Court found that her representation provided evidence of *intent* to waive the security interest and was sufficient to estop her from claiming the collateral. *Poteau State Bank*, 597 P.2d at 761. Here, however, Case made no representations to any party concerning the collateral. In fact, the extension agreement reaffirmed the security interest.

*National Livestock Credit Corp. v. Schultz*, 653 P.2d 1243 (Okla.App.1982), a decision by the Oklahoma Court of Appeals, is more typical of decisions finding an implied authorization to sell farm products.[6] The Schultz cattle operation was financed through a series of notes with the National Livestock Credit Corp. ("National") from 1964 to 1973. Each note included a security agreement creating a security interest in cattle and proceeds and prohibiting sale of the collateral (the cattle) without written consent of the secured party. Yet National never enforced that provision

and "never rebuked Schultz for ignoring the terms of the security agreement relating to sales of secured cattle." *Id.* at 1244. In 1974 and 1975 Schultz experienced financial difficulty and sold some of the cattle without applying the proceeds to his indebtedness with National. National then attempted to enforce a claim against the purchasers of the cattle. The trial court granted summary judgment for Schultz and the purchasers. The Oklahoma appellate court affirmed the trial court's finding "that National waived the sale restriction terms of the security agreement through a 'course of performance' that allowed Schultz to remit only the proceeds of such sales to National." *Id.* at 1245. This court considered a similar claim in *First Nat'l Bank and Trust Co. v. Iowa Beef Processors, Inc.*, 626 F.2d 764 (10th Cir.1980) and affirmed a summary judgment by the district court in favor of a cattle purchaser. In contrast, the facts of this case offer no suggestion of a prior course of dealing or performance that would allow us to find an implied authorization for the sale of the tractor.[7]

In summary, we have carefully reviewed the record and conclude that there is no evidence to support a finding that Case authorized the sale of the tractor or waived its security interest. Even if we assume that Case knew that Crites had sold the tractor to Timm, its actions are not inconsistent with a continued assertion of the

6. For comparable decisions from other jurisdictions see *Neu Cheese Co. v. Federal Deposit Ins. Corp.*, 825 F.2d 1270, 1273 (8th Cir.1987) ("The course of dealing between the debtor and the bank had been established for almost twenty years."); *Producers Cotton Oil Co. v. Amstar Corp.*, 197 Cal.App.3d 638, 242 Cal.Rptr. 914, 918 (1988) ("The parties' course of dealing [over three crop years] established that Producers acquiesced to and impliedly authorized the 1981 crop sale to Amstar."); *Colorado State Bank v. Hoffner*, 701 P.2d 151, 153 (Colo.Ct.App.1985) (Despite language of security agreement, "the normal trade practice of the bank was never to require its debtors to obtain written permission to sell the collateral."); *First National Bank v. Westgate Elevator Co.*, 412 N.W.2d 916, 4 UCC Rep.Serv.2d 903, 905 (Iowa 1987) ("[W]here, as here, the lender routinely permits the debtor to sell collateral without authorization, the lender

thereby waives its security interest in the collateral after sale."). *See also* 7 U.S.C. § 1631 (protection for purchasers of farm products).

7. In contrast to the crops and livestock cases cited *supra* at note 5, most jurisdictions are reluctant to find an implied authorization to sell a single vehicle or piece of equipment. *See, e.g., Central California Equipment v. Dolk Tractor*, 78 Cal.App.3d 855, 144 Cal.Rptr. 367, 371 (1978) (no authorization of sale or waiver of security interest in corn harvester); *Swift v. J.I. Case Co.*, 266 So.2d 379, 381 (Fla.1972) (security interest in tractor continues despite sale); *Citizen Savings Bank v. Sac City State Bank*, 315 N.W.2d 20, 26 (Iowa 1982) ("[H]ere there was no prior course of dealing to support a finding that Sac City authorized a bulk conveyance of business assets [in an automobile dealership].").

**316**

security interest in the tractor. Therefore, the district court judgment is AFFIRMED.