589 F.2d 497
 1978-2 Trade Cases 62,396, 4 Media L. Rep. 2276
 George FARNELL, Plaintiff-Appellant,
v.
ALBUQUERQUE PUBLISHING COMPANY, Tom Lang, and J. L. Dixon,
Jr., Journal Publishing Company, and New Mexico
State Tribune Company, Inc., Defendants-Appellees.
 No. 78-1181.
 United States Court of Appeals,
Tenth Circuit.
 Argued Oct. 24, 1978.
Decided Dec. 28, 1978.
 
 Kent Winchester, Albuquerque, N. M., for plaintiff-appellant.
 Eric D. Lanphere of Johnson & Lanphere, Albuquerque, N. M., for defendant-appellee, Albuquerque Pub. Co.
 John B. Tittman, Albuquerque, N. M., for defendant-appellee, New Mexico State Tribune Co., Inc.
 Before SETH, Chief Judge, and BARRETT and DOYLE, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 George Farnell (Farnell) has appealed an adverse judgment in an action wherein he alleged violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and § 3 of the Clayton Act, 15 U.S.C. § 14.
 
 
 2
 The Albuquerque Publishing Company, owned equally by the Journal Publishing Company (Journal) and The New Mexico State Tribune Company, Inc. (Tribune), publishes and distributes the only Albuquerque daily newspapers. Defendant Tom Lang is the president of both the Albuquerque Publishing Company and the Journal Publishing Company. Defendant Jess Dixon was the circulation director of the Albuquerque Publishing Company from 1974 until early, 1978. The Journal Publishing Company edits the Albuquerque Journal. The New Mexico State Tribune Company, Inc. edits the Albuquerque Tribune.
 
 
 3
 Farnell was employed by the Albuquerque Publishing Company as a Journal district manager on June 6, 1963, and continued in that position until his termination on December 5, 1975. During that period of time, Farnell was a full-time salaried employee working a 40 hour week. His initial starting salary was $65.00 per week. He received numerous salary increases and, on the date of his termination, was making approximately $1,006.56 per month. Appropriate deductions for social security, federal and state income taxes were withheld by the publishing company from his salary.
 
 
 4
 As a district manager, Farnell was required to: recruit carriers to service routes located within his assigned district; deliver the Journal to designated "drop points" where the carriers would obtain the newspapers for home distribution; collect from the carriers the wholesale price charged them by the company; handle all home subscriber complaints received by the company, such as the failure of any carrier to deliver a paper to a subscriber; and actually deliver papers on any route temporarily without a carrier.
 
 
 5
 The carriers, on the other hand, were responsible for the actual delivery of the Journal to home subscribers. These carriers purchased newspapers wholesale from the company and sold them retail to the home subscriber. They were required to pay the company for all papers they ordered, whether or not they received payment from their home subscribers. They were also required to collect from their customers the retail price of the paper. The difference between this price and the amount charged them by the Journal was the amount earned by each carrier.
 
 
 6
 This "home carrier" distribution system accounted for most of the Journal's sales in the Albuquerque area. However, both the Journal and Tribune were distributed in a "single-copy sales market" through coin operated paper racks, street sales and over the counter sales at various retail outlets.
 
 
 7
 During the April through June billing quarter of 1973, Farnell raised the price charged to subscribers serviced by his carriers above the price suggested by the Journal. The rate set and published by the Albuquerque Publishing Company was $7.15. Farnell charged $7.75. Upon learning of the increase, Farnell was immediately advised to roll back his price increase or be terminated. Farnell acceded and since has not charged a home delivery rate different than that set by the company. Reportedly, this episode received great notoriety amongst the carriers and, according to Farnell, deterred them from exercising their pricing freedom.
 
 
 8
 Farnell also supplemented his employee income through the single-copy sales market. At the time of his termination, Farnell had eleven single-copy sales outlets located within his district. The majority of these outlets were in apartment houses.
 
 
 9
 In mid 1975, the company raised the purchase price for daily newspapers from 10 cents to 15 cents. The new price was mandatory at company-owned outlets and was a suggested retail price for independent contractors.
 
 
 10
 At approximately the same time, the company converted its independent contractor single-copy sales distribution system to an in-house, employee-staffed single-copy sales department. This single-copy sales department was created by the publishing company which bought out the six known and authorized single-copy independent sales dealers in the Albuquerque area. The publishing company's stated reasons for converting its single-copy sales distribution system from independent contractor basis to an in-house operation were, among other things, to: eliminate inefficiencies inherent in the independent contractor system resulting from their failure to properly service racks throughout the day, which in turn caused some racks to be sold out while other racks were full and unsold; allow the company to charge uniform prices through direct employee sale of newspapers in the single-copy market; avoid anti-trust problems of customer restraints, territorial restrictions and pricing; and generally realize higher revenue by increasing efficiency and lowering prices charged to home subscribers.
 
 
 11
 Although district managers of the Journal were not authorized to engage in single-copy sales, it was suspected that some district managers were engaging in this activity without company knowledge. Accordingly, on June 25, 1975, the company distributed a written notice to all Journal district managers, including Farnell, which informed them of the conversion and directed them to report the number and location of any racks they might be servicing. A dispute exists as to whether or not Farnell responded to this notice. Nevertheless, it is clear that in late September or early October of 1975, the company learned that Farnell was making single-copy sales to Winchell's donut shop in Albuquerque.
 
 
 12
 On October 24, 1975, the company mailed a letter to Farnell, advising him of its policy barring employees from engaging in single-copy sales and warning him that he would be terminated should he continue to engage in such activity. Notwithstanding the written notice, Farnell continued to engage in single-copy sales. When the company learned of Farnell's continuing violations of its company rules, he was requested to remove his single copy sales racks. Farnell refused. He was terminated for his failure to do so, as well as for various other acts of insubordination. The company thereafter refused to deal with Farnell under any circumstances.
 
 
 13
 On May 5, 1976, Farnell filed the instant suit seeking treble damages and issuance of an injunction for violations of §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act.
 
 
 14
 Jurisdiction vested in the District Court pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1337. Farnell no longer seeks injunctive relief under § 16 of the Clayton Act.
 
 
 15
 In his second amended complaint, Farnell alleges, in essence, that the defendants conspired to force Farnell and other independent wholesale distributors of the Journal and Tribune to charge their customers a retail rate established by the defendants and, as a result of Farnell's refusal to comply with the defendants' pricing policies, he was terminated from his employment, forced out of business and precluded from engaging in single-copy sales. He also alleges various anti-trust violations arising out of the defendants' conversion of their single-copy distribution system; monopolization of the relevant market; and their refusal to deal with Farnell and other independent contractors after their termination. Farnell seeks compensatory damages in the amount of $600,000.00 and treble damages in the amount of $1,800,000.00.
 
 
 16
 After extensive discovery and various pre-trial skirmishes, the defendants moved for summary judgment. On November 15, 1976, an order was entered dismissing the action on the grounds that Farnell's termination did not result from anti-trust violations, but rather from his failure to adhere to the Journal's rules and regulations and insubordination.
 
 
 17
 Various issues are raised on appeal, but our determination that Farnell lacks standing to sue under the anti-trust laws is dispositive.
 
 I.
 
 18
 Farnell grounds his claims for treble damages on § 4 of the Clayton Act, 15 U.S.C. § 15, which reads:
 
 
 19
 Any person who shall be injured in his business or property By reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to an amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee. (Emphasis supplied.)
 
 
 20
 Read literally, this statute grants broad relief to any person who is injured by an anti-trust violation. The inherent problems in such a construction are manifest. Accordingly, the courts have impressed strict standing requirements on private litigants seeking relief under the anti-trust laws. In Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), the Court said: "(t)he lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." 405 U.S. at 263, 92 S.Ct. at 891-892, Note 14.
 
 
 21
 To establish standing to maintain a private anti-trust action in this Circuit, a plaintiff must meet a two-pronged test. First, he must allege injury to his "business or property" within the meaning of the Act and, second, he must show proximate causation that the injury directly resulted from a violation of the anti-trust laws. Reibert v. Atlantic Richfield Company,471 F.2d 727 (10th Cir. 1973), Cert. denied, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973); Nationwide Auto Appraiser Serv. v. Association of C & S Co., 382 F.2d 925 (10th Cir. 1967).
 
 
 22
 Farnell has met the first prong of this test. His activities in the single-copy sales market clearly constituted a commercial venture or enterprise. Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). The alleged anti-trust violations are directed toward him personally.
 
 
 23
 Our analysis of whether Farnell meets the causation requirement of the second prong of the standing test presents a more difficult question. We stated in Reibert v. Atlantic Richfield Company, supra, that:
 
 
 24
 Antitrust violations admittedly create foreseeable ripples of injury to individual stockholders, consumers and employees, but the law has not allowed all of these standing to sue for treble damages. (Citation.) The aggrieved party must satisfy the "by reason of" and/or "by" requirements found in Sections 4 and 16 of the Clayton Act, respectively. This prerequisite boils down to a complainant proving that the antitrust violations are the proximate cause of his injury. Two elements are necessary to demonstrate proximate cause: (1) there is a causal connection between an antitrust violation and an injury Sufficient to establish the violation as a substantial factor in the occurrence of damage ; and (2) that the illegal act is linked to a plaintiff engaged in activities intended to be protected by the antitrust laws. (Citation.) . . . (Emphasis supplied.)
 
 
 25
 471 F.2d at 731.
 
 
 26
 Farnell fails to satisfy the first element of the proximate causation test. The record demonstrates that Farnell's termination and the defendants' subsequent refusal to deal with him resulted from his refusal to follow his employer's directives and his insubordinate conduct. We do not deem it necessary to detail every instance of misconduct. However, it is desirable to summarize some of the areas of misconduct engaged in by Farnell in order to facilitate a clear understanding of our disposition.
 
 
 27
 Farnell was terminated as a Journal district manager on December 5, 1975, by means of a letter which stated the reasons for termination as follows:
 
 
 28
 This is to advise you that you have continued to engage in single-copy sales in direct violation of my October 24, 1975, written warning. You have also been insubordinate on several occasions to your supervisory personnel.
 
 
 29
 Your employment with the Albuquerque Publishing Company is hereby terminated effective Friday, December 5, 1975.
 
 
 30
 (Appendix 24.)
 
 
 31
 As previously indicated, Farnell was an employee of the Journal Publishing Company. As an employee, he was bound to follow certain directives issued by his employer. Among his duties to his employer, was a duty not to compete with his employer concerning the subject matter of his employment and a duty to deal fairly with his employer at all times. See: Restatement (Second) of Agency, §§ 2 and 393. Farnell's job duties as Journal district manager did not include any activity with regard to single-copy sales. Journal district managers and other employees of the company were not authorized to engage in single-copy sales in any capacity. In fact, since 1970, it had been a policy of the company that no one carrying a route as an independent contractor could be employed in any capacity by the Albuquerque Publishing Company. Despite oral and written warnings, Farnell continued to engage in such activities in violation of the company's rules and his common-law duty not to compete with his employer. The Journal's termination of Farnell was legitimate and not in violation of any anti-trust law.
 
 
 32
 On November 30, 1975, the publishing company received approximately 52 complaints from home subscribers concerning either missed or defective deliveries in Farnell's district. Under the terms of Farnell's employment, he had a duty to investigate and correct each of these complaints. Despite this duty, Farnell refused to do so. After being instructed to undertake investigations by his supervisor, Farnell stated in no uncertain terms, using profane and abusive language, that he refused to comply with the directive. This insubordination, standing alone, would have constituted justification for Farnell's termination. 53 Am.Jur.2d, Master and Servant § 58 (1970).
 
 
 33
 We also observe that Farnell acknowledged that he engaged in two other major violations of company policy. Despite warnings from company management, he continued to actually deliver papers during company time on various routes in his district pursuant to independent carrier contracts executed in fictitious names; and he continued a practice whereby he made collections on behalf of the carriers he was supervising for which the carriers tendered him 50% Of their profit.
 
 
 34
 We are aware that summary procedure should be used sparingly in anti-trust litigation. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Furthermore, summary judgment should issue only where there is no genuine issue of material fact. Harman v. Diversified Medical Investments Corporation, 488 F.2d 111 (10th Cir. 1973). Under this rule, no margin exists for disposition of factual issues. Machinery Center, Inc. v. Anchor Nat. Life Ins. Co., 434 F.2d 1 (10th Cir. 1970). Summary judgment does not serve as a substitute for trial, and it does not require the parties to dispose of their claims solely on documentary evidence. Ando v. Great Western Sugar Company, 475 F.2d 531 (10th Cir. 1973). Nevertheless, summary judgment is a useful tool which may avoid needless trials. Alt v. American Income Life Ins., 337 F.2d 472 (10th Cir. 1964). This is especially true in the area of anti-trust litigation where the complex nature of the subject matter mandates that, absent a valid claim, defendants be protected against the heavy burden of expense and effort entailed in a protracted and intricate trial. Moreover, the proper administration of justice requires that the court's energy and time not be deflected by unnecessary and time consuming trials to the detriment of other litigants.
 
 
 35
 The record establishes that Farnell failed to raise a "genuine issue as to any material fact." Entry of summary judgment was, therefore, proper.
 
 
 36
 WE AFFIRM.