**MOTIVE PARTS WAREHOUSE,**
Plaintiff-Appellant,

v.

**FACET ENTERPRISES,**
Defendant-Appellee.

No. 82–2131.

United States Court of Appeals,
Tenth Circuit.

Sept. 27, 1985.

---

Robert W. Steele (W. Donald Dresser and Cheryl Browning, with him on briefs), Howrey & Simon, Washington, D.C., for plaintiff-appellant.

Burck Bailey, Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, Okl. (Fraser McAlpine, Andrews & Kurth, Houston, Tex., with him on brief), for defendant-appellee.

Before BARRETT and McKAY, Circuit Judges, and BURCIAGA, District Judge.*

BURCIAGA, District Judge.

Facet Enterprises ["Facet"], Appellee—a supplier of, *inter alia*, P & D brand auto parts and equipment—filed suit against Motive Parts Warehouse ["MPW"], Appellant—a warehouse distributor doing business in the automotive replacement parts aftermarket—to collect on an open account for goods sold. MPW counterclaimed, alleging violations by Facet of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and Sections 2(a), (d) and (e) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (d) and (e) (1976), as well as breach of contract, misrepresentation, and intentional infliction of economic harm.

The district court granted summary judgment to Facet on its complaint, leaving for trial the counterclaims asserted by MPW, including the question of setoff damages allegedly arising from Facet's failure to make appropriate credits to MPW's account. The case was tried to a jury, with MPW in the position of plaintiff and Facet in the position of defendant.

Following ten days of evidence, the trial judge granted Facet's motion for directed verdict on the Sherman Act and Robinson-Patman Act claims arising from Facet's Wagon Master franchise program, and on MPW's pendent claims for misrepresentation and intentional infliction of economic harm. MPW's remaining Robinson-Patman Act claims concerning Facet's sales to Keystone Automotive Warehouse ["Keystone"], and its breach of contract claim against Facet were submitted to the jury. The jury returned a verdict in Facet's favor on each of those claims.

MPW's subsequent motions for judgment notwithstanding the verdict or for

* Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, sitting by designation.

new trial were denied, and judgment was entered against MPW on all claims. In addition, the court assessed postjudgment interest at 15% per annum and awarded attorneys' fees to Facet in the amount of $80,246.50.

On appeal, MPW asserts that the trial court erred in granting Facet's motion for directed verdict with respect to the Sherman Act and Robinson-Patman Act claims arising from the Wagon Master franchise program, and the pendent claim for intentional infliction of economic harm. MPW does not appeal the directed verdict against it on its misrepresentation claim. MPW also contends that the trial court erred in denying judgment notwithstanding the verdict or a new trial on its Robinson-Patman Act claims arising from Facet's sales to Keystone, and its breach of contract claim. Finally, MPW asserts that postjudgment interest, if any, should be assessed pursuant to current law, and that the district court's grant of attorneys' fees was excessive and constituted an abuse of discretion.

## I. Claims Concerning the Wagon Master Franchise Program

In April, 1976, as the result of a settlement in lengthy litigation between the Federal Trade Commission and the Bendix Corporation, appellee Facet was created to compete with Bendix in the automotive aftermarket. As part of the settlement, Bendix transferred to Facet the sales operation for P & D brand auto parts, to be overseen by Facet's P & D Automotive Division ["P & D"]. In the fifty years prior to Facet's assumption of the P & D sales operation, Bendix' P & D component had manufactured and then sold its parts primarily to warehouse distributors ["WDs"] such as MPW, who in turn resold the merchandise to jobbers. Under Facet, P & D no longer had the profit margin associated with the manufacture of products, and found itself competing directly with manufacturers for the sale of parts to warehouse distributors. As a consequence, P & D continually lost money.

From Facet's creation in 1976 until August, 1980, P & D's primary method of distributing its products was through sales to WDs such as MPW. MPW operates 13 regional warehouses in the Gulf Coast area.

In January, 1980, Facet advised P & D's management that it must take steps to make the division profitable. P & D thereafter decided to augment its distribution system by establishing a franchise marketing program known as the "Wagon Master Plan." The plan envisioned direct sales of a limited number of high turnover P & D products to the jobber and retail dealer markets by P & D franchisees, who would operate from trucks stocked with the requisite inventory. Such a marketing scheme, which bypasses the WD market, was successful for one of Facet's customers, and was working in other markets as well.

P & D did not anticipate terminating its relationships with any of its WD customers and, indeed, up to the time of trial, it continued to service over 400 WDs. Rec., Vol. XI at 13. P & D predicted, however, that up to 90% of its WD customers would seek other sources of supply once the Wagon Master program became operational. P & D's predictions were amazingly accurate: within a year after the franchise program became operational, P & D had lost between 75–90% of its WD business. Rec., Vol. XI at 13, 80; Vol. XVII at 110.

In the event WD customer losses occurred as predicted, P & D anticipated considerable cost savings through the subsequent trimming down of its full line inventory (approximately 4,000 parts had to be stocked in order to service the WD market) to a limited number (approximately 600) of high turnover items. P & D also anticipated cost savings from the eventual paring down of its sales force from 60 salesmen to as few as five or six, inasmuch as franchisees would not require ongoing sales and field assistance as did large WD customers like MPW.

Facet's management approved the franchise concept in March of 1980. Only a few managerial level P & D employees knew about the plan prior to corporate approval. After such approval, Facet dis-

cussed the plan with its zone managers, who directed the P & D sales force, in April 1980. Thereafter, Facet informed its P & D sales employees of the plan and offered them an opportunity to acquire franchises. Approximately 35 of the company's 60 salesmen eventually became franchisees. Prospective franchisees were required to sign a nondisclosure agreement before they could learn about the new program. Despite such efforts to prevent dissemination of the plan, MPW learned about the franchise program on or about June 11, 1980. The franchise plan was due to become operational in August, 1980.

MPW contends that Facet and its prospective franchisees conspired to set franchisee prices at levels approximately 35% lower than WD prices, and agreed that Facet would maintain prices charged to MPW and other WDs at then current levels, giving the franchisees immense competitive advantage. MPW also contends that Facet and its prospective franchisees agreed that necessary sales assistance to the WDs would be curtailed in order to drive WDs out of the business of selling P & D products.

After learning of the franchise plan, including details of the alleged price fixing, MPW contacted Standard Motor Products ["Standard"]—a competitor of P & D which already supplied seven of MPW's thirteen warehouses—and decided to make Standard its new supplier in its six remaining warehouses, all of which then stocked P & D products. In July, 1980, Standard lifted all but a fraction of MPW's P & D inventory in those six warehouses and replaced it with Standard products. MPW claims that it was forced to change suppliers in order to mitigate its damages. Although MPW contends that the franchisees entered the market in April and were actively competing for MPW's customers at that time, the trial court found, and the evidence reflects, that no Wagon Master sales were made until August, 1980, *after* MPW had unilaterally terminated its relationship with Facet.

MPW asserted the following five claims against Facet with respect to the Wagon Master franchise program:

1) that Facet and its prospective franchisees unlawfully conspired to fix prices and to boycott MPW, which constituted *per se* violations of Section 1 of the Sherman Act;

2) that Facet unreasonably restrained trade, in violation of Section 1 of the Sherman Act under the Rule of Reason;

3) that Facet violated the Robinson-Patman Act by offering discriminatory prices, terms and promotional services to its franchisees in order to give them a competitive advantage;

4) that Facet intentionally interfered with MPW's contract rights and its ability to serve its customers, which constituted intentional infliction of economic harm; and

5) that Facet breached its contract with MPW with respect to provision of sales help, merchandise returns, change-over assistance, payment terms, catalogs and cooperative advertising.

The trial court directed a verdict against MPW on the first four claims. The standard of review in assessing whether a verdict should have been directed is the same standard applied by the trial court in passing on a motion for directed verdict initially, *i.e.*, whether the evidence is sufficient to create an issue for the jury. *Swearngin v. Sears Roebuck & Co.*, 376 F.2d 637, 639 (10th Cir.1967). The trial court may direct a verdict only where the evidence and all inferences to be drawn therefrom are so clear that reasonable minds could not differ on the conclusion. *Taylor v. Gilmartin*, 686 F.2d 1346 (10th Cir.1982), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983). The evidence must be viewed in the light most favorable to the party against whom the directed verdict is sought, and if, on the basis of the evidence and inferences to be drawn therefrom, reasonable and fair-minded persons might form different conclusions as to the facts in issue, a directed

verdict is improper. *Zelinger v. Uvalde Rock Asphalt Co.*, 316 F.2d 47 (10th Cir. 1963). Stated another way, "a directed verdict is justified 'only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion.'" *Kiner v. Northcut*, 424 F.2d 222, 223 (10th Cir.1970) (quoting *Fischer Construction Co. v. Fireman's Fund Insurance Co.*, 420 F.2d 271, 275 (10th Cir.1969)).

With the foregoing principles in mind, we have thoroughly reviewed the record in this case, which comprises 29 volumes. The trial transcript alone spans 16 volumes and more than 1300 pages, supplemented by more than 850 pages of designated pleadings, in excess of 100 trial exhibits, and 3 volumes of post-trial hearing transcripts. Having reviewed these materials in the required manner, we conclude that the trial court's rulings with respect to the Wagon Master claims must be affirmed in part and reversed in part. We will discuss each of the claims in turn.

### A. Sherman Act Claims

The trial court concluded that Facet's management independently undertook to change its method of distribution and that Facet's principal motive in so doing was to improve its profit position. In the trial court's view, "[i]n our private enterprise system ... Facet had this fundamental right so long as it was not motivated by anticompetitive purposes." Rec., Vol. XII at 18. Although the trial court felt there might well be some breach of contract matters and breach of business ethics arising from the Wagon Master undertaking, it concluded that there was no evidence to support MPW's claims of price fixing, boycott or restraint of trade. *Id.* at 18–19. In its order denying MPW's motion for judgment n.o.v. or a new trial, the trial court further observed that "MPW has at no time demonstrated injury to competition generally." Rec., Vol. II at 827. With respect to the alleged price fixing, the court concluded from the evidence presented that "[although] Facet and its prospective Wagon Master franchisees discussed

necessary percentage markup, ... the franchisee was free to and did set his own prices." *Id.*

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination ... or conspiracy, in restraint of trade." 15 U.S.C. § 1. "Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (citing *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1910)). The courts have deemed certain practices to be *per se* unreasonable, because of their pernicious effect on competition and lack of any redeeming virtue. Among the practices conclusively presumed to unreasonably restrain competition are price fixing, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210, 60 S.Ct. 811, 838, 84 L.Ed. 1129 (1940), and group boycotts, *Fashion Originators' Guild v. Federal Trade Commission*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). Where such practices are established by the evidence, they are considered *per se* violations of the Sherman Act "without elaborate inquiry as to the precise harm they have caused" to competition. *Northern Pacific Railway*, 356 U.S. at 5, 78 S.Ct. at 518.

With respect to the combination or conspiracy requirement of § 1, it is well established that "solely unilateral conduct, regardless of its anti-competitive effects, is not prohibited." *Contractor Utility Sales v. Certainteed Products*, 638 F.2d 1061, 1074 (7th Cir.1981). A company's unilateral decision to change its distribution system is not, by itself, prohibited by the Sherman Act. *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1030 (2d Cir.) *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). Indeed, a company may contract with a new distributor and as a consequence terminate its relationship with a former distributor without running afoul of the Sherman Act, even if the effect

of the new contract is to seriously damage the former distributor's business. *Dart Industries, Inc. v. Plunkett Co. of Oklahoma,* 704 F.2d 496 (10th Cir.1983); *Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245 (5th Cir.1975). *And see Craig v. Sun Oil Co. of Pennsylvania,* 515 F.2d 221 (10th Cir.1975), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976) (conspiracy resulting merely in substitution of one distributor for another does not violate § 1, nor is an increase in the number of distributors actionable under that section).

■ In the case at bar, Facet argues—and the trial court apparently agreed—that it acted unilaterally in adopting the Wagon Master franchise program and that there was no evidence of conspiracy between it and the prospective franchisees. Facet points to the fact that all the prospective franchisees were P & D employees, and to the general rule that a corporation cannot conspire with its own employees. *See Holter v. Moore & Co.,* 702 F.2d 854, 855 (10th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 347, 78 L.Ed.2d 313 (1983). One exception to that general rule, however, is that employees are capable of combining with their corporate employer where they have an "independent personal stake" and thus stand to benefit from conspiring with the corporation to restrain trade. *Holter,* 702 F.2d at 857, n. 8.

The evidence adduced at trial reflects that Facet's initial decision to adopt the franchise concept was a unilateral business decision. Facet, acting in its own independent self-interest, saw the franchise concept as a means to cut costs and hopefully remedy P & D's profit and loss record. Once the general concept had gained corporate approval, however, P & D management personnel met with prospective franchisees on numerous occasions to work out pricing and other details of the franchise program. MPW argues that Facet's conduct ceased to be unilateral when, in May and June of 1980, the prospective franchisees negotiated with P & D management regarding prices to be charged to them and their WD competitors. One prospective franchisee testified that when he attended the meetings where pricing was discussed, he was acting as an independent businessman, rather than a Facet employee, and was "trying to get the best prices I could for myself and the rest of us in this program." Rec., Vol. XVIII at 349 (testimony of Billy Lloyd Hammers). Another prospective franchisee testified, "we were concerned ... that they [Facet] would start selling the WDs at the same price they were going to sell to us.... And they [Facet] said that this wouldn't happen." Rec., Vol. XXII at 941 (testimony of Don Watson). Jack Ladner, sales manager for P & D, admitted that he personally agreed with the prospective franchisees to fix WD prices at then current levels:

Q. And did you agree you would keep on selling the existing warehouse distributors at the prices they were getting?

A. That's correct.

Q. So you made that agreement with these franchisees ...?

A. Yes, sir.

Rec., Vol. XI at 61.

One reasonable inference to be drawn from the foregoing testimony is that the prospective franchisees, acting in their own self-interest as independent businessmen, sought to suppress competition from the WDs by securing Facet's agreement to charge WDs substantially higher prices than it had agreed to charge the franchisees. "Price is the 'central nervous system of the economy,' and an agreement that 'interfere[s] with the setting of price by free market forces' is illegal on its face." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) (citations omitted). As noted by the Third Circuit Court of Appeals in *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 168–69 (3d Cir.1979):

When a manufacturer acts on its own, in pursuing its own market strategy, it is seeking to compete with other manufacturers by imposing what may be defined as reasonable vertical restraints....

However, *if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier.* [Emphasis supplied].

. . . . .

If the purpose and effect of the challenged conduct is to restrain price movement and the free play of market forces, it is then illegal *per se.* As the Supreme Court stated in the celebrated price-fixing case, *United States v. Socony-Vacuum Oil Co.:*

> Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they ... stabilized prices they would be directly interfering with free play of market forces. 310 U.S. at 221 [60 S.Ct. at 843].

■ Viewing the record in the light most favorable to MPW, as we must on review of the directed verdict against it, *Mackey v. Burke,* 751 F.2d 322, 325 (10th Cir.1984), we conclude that there was sufficient evidence from which the jury could have found that the prospective franchisees had an independent personal stake in seeking to stabilize WD prices, and that there was, in fact, agreement between the prospective franchisees and Facet to fix WD prices, thereby creating a horizontal restraint on competition between the WDs and the franchisees. There was likewise sufficient evidence from which the jury could have found that the conduct of the alleged co-conspirators had either the purpose or the effect of unreasonably restraining trade under a rule of reason analysis. It was thus error for the trial court to direct a verdict with respect to MPW's price-fixing and unreasonable restraint claims, and MPW is entitled to a new trial on those claims.

Facet contends that even if there was evidence to support the price-fixing claim, that MPW has no standing, as a matter of law, to recover for the alleged price fixing. In Facet's view, because MPW changed suppliers prior to the time the franchise program became operational, and thus never purchased from Facet at the allegedly fixed prices, MPW has no standing to make a price-fixing claim. MPW contends that it has standing by virtue of the fact that it was the target of the alleged price fixing. MPW relies upon the Supreme Court's discussion of antitrust standing in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). In that case, the Court remarked that Section 4 of the Clayton Act—which provides a treble-damages remedy to any person injured in his business or property by reason of anything forbidden by the antitrust laws —"does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers.... The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Id.* at 472, 102 S.Ct. at 2545.

The trial court never expressly addressed the issue of standing. It appears from the record that Facet raised the standing issue in a motion for partial summary judgment filed several months before trial. Rec., Vol. I at 219. The trial court denied that motion as to the Sherman Act claims. The only grounds specified for the denial were that the court was not satisfied that genuine issues of material fact were not present, and that it was unclear whether MPW could make a *prima facie* showing on its conspiracy claim. Rec., Vol. II at 490. Because the trial court allowed the Sherman Act claims to proceed to trial on the merits, we assume by implication that the court concluded that there was no want of standing. This assumption is bolstered by the fact that the trial court's subsequent grant of Facet's Motion for Directed Verdict makes no mention of the standing issue. Because a copy of Facet's Motion for Directed Verdict was not included in the designated record on appeal, we have

no means to determine whether the standing issue was raised in that motion.

■ Standing is a question of law for the court to determine. *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495, 498 (9th Cir.1977). In this circuit, standing in antitrust cases is measured by the following two-prong test, set forth in *Farnell v. Albuquerque Publishing Co.*, 589 F.2d 497, 500 (10th Cir.1978):

> First, [plaintiff] must allege injury to his "business or property" within the meaning of the Act and, second, he must show proximate causation—that the injury directly resulted from a violation of the antitrust laws.

The causation element was more fully addressed in *Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 731 (10th Cir.) *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973), where we observed as follows:

> Two elements are necessary to demonstrate proximate cause: (1) there is a causal connection between an antitrust violation and an injury sufficient to establish the violation as a substantial factor in the occurrence of damage; and (2) that the illegal act is linked to a plaintiff engaged in the activities intended to be protected by the antitrust laws.

The causation question, by its very nature, requires an analysis of the facts.

Appellate courts have, on occasion, considered and decided the issue of standing despite the lower court's failure to address the issue. *See* Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 3531.15 n. 10 and cases cited therein. Where, as in the case at bar, grounds for new trial exist, we deem it more appropriate to have the trial court specifically address the standing issue on remand. The trial court should make specific factual findings to support its legal conclusion on the standing issue, following the guidelines set forth in *Farnell* and *Reibert, supra,* and taking into consideration the Supreme Court's discussion of antitrust standing in *Blue Shield, supra.*

■ With respect to MPW's group boycott claim, we agree with the trial court's conclusion that there was insufficient evidence to support such a claim. Although it appears from the record that the quality and quantity of P & D services to MPW diminished during the Spring of 1980—when the franchise plan was being formulated and the prospective franchisees were negotiating with P & D and beginning to explore the market for their respective franchises—there is simply no evidence of any refusal to deal. MPW failed to offer any evidence of a cognizable group boycott. We therefore affirm the trial court's directed verdict on the group boycott claim.

### B. Robinson-Patman Act claims

MPW contends that Facet afforded its franchisees discriminatory prices, terms, and services designed to undercut MPW and other WDs, in violation of the Robinson-Patman Act. 15 U.S.C. § 13 (1976). The trial court concluded that "MPW was not a reasonably contemporaneous purchaser with the Wagon Master franchisees such as is required to support a violation of section 2(a) of the Robinson-Patman Act. 15 U.S.C. § 13(a)." Appellee's Brief, Appendix F at 6. The court stressed that the record was unequivocal as to the fact that MPW unilaterally terminated its relationship with Facet before the Wagon Master program became operational. *Id.*

■ Illegal price discrimination under § 2(a) of the Robinson-Patman Act "requires that the same product be sold at different prices to competitors." *Dart Industries, Inc. v. Plunkett Co. of Oklahoma,* 704 F.2d 496, 499 (10th Cir.1983). Discrimination in services and allowances under §§ 2(d) and 2(e) of the Act likewise requires that the favored and disfavored customers stand in some competitive relationship with one another. *See* discussion, *infra,* at Section II–B. The record is devoid of evidence of *any* competition between MPW and the Wagon Master franchisees. The trial court concluded, and we agree, that there was no evidence from which the jury could have found MPW to

be a reasonably contemporaneous purchaser within the meaning of the statute as construed by the courts. We therefore affirm the directed verdict in Facet's favor on MPW's Robinson-Patman Act claims arising from the Wagon Master franchise program.

## C. Intentional Infliction of Economic Harm

The trial court also directed a verdict against MPW on its claim of intentional infliction of economic harm, finding that the element of malice had not been established. We construe this claim as a charge of malicious interference with contract or business relationships. Under Oklahoma law, MPW was required to present evidence that Facet maliciously interfered with MPW's relations with its customers. *Mac Adjustment, Inc. v. Property Loss Research Bureau*, 595 P.2d 427 (Okla. 1979). Malice is defined as the intentional performance of a wrongful act without justification or excuse. *Bennett v. City National Bank & Trust Co.*, 549 P.2d 393, 397 (Okla.1975); *Schonwald v. Ragains*, 32 Okla. 22, 122 P. 203 (1912).

■ Having reviewed the record in the light most favorable to MPW, we find no evidence from which the jury could have concluded that Facet acted with malice in its dealings with MPW or intentionally interfered with MPW's relations with its customers. We therefore affirm the trial court's grant of a directed verdict as to the malicious interference claim.

## D. Breach of Contract

Prior to trial, the district court granted summary judgment to Facet on its complaint for monies due from MPW on an open account, leaving for trial MPW's counterclaim for breach of contract. MPW sought damages for Facet's alleged failure to make appropriate credits to MPW's account, and to pay sums MPW claimed it was owed on termination of the contract between the two companies. The jury found in Facet's favor on MPW's breach of contract counterclaim.

On appeal, MPW contends that it is entitled to a new trial on its breach of contract counterclaim. As grounds for a new trial, MPW asserts 1) that the trial court erred in granting summary judgment to Facet on its open account claim before trial of MPW's counterclaim, which MPW viewed as asserting setoffs against any amount owing to Facet; 2) that false testimony was presented on a material issue at trial to MPW's prejudice; and 3) that the trial court erroneously permitted the question of notice of breach to go to the jury.

■ We find no error in the trial court's grant of summary judgment to Facet on its complaint. MPW's counterclaim was wholly unrelated to the goods which were the subject of Facet's open account claim. It was undisputed that MPW accepted the subject goods when tendered, never revoked its acceptance of the same, and never notified Facet of any defect in the goods. We agree with the following analysis of the issue by the trial court:

It seems self-evident where a seller asserts a claim for an amount owing on an open account, and the buyer admits accepting the goods and does not dispute the amount it was billed for the purchase of the goods, and further, the buyer retains possession of the goods, there is no impediment to a grant of summary judgment in favor of the seller for the contract price of the goods. Such a grant of summary relief in no way prejudices the ability of the counterclaiming buyer to demonstrate and recover damages alleged to have resulted from the seller's breaches of contract unrelated to the goods themselves.

Brief of Appellee, Appendix A at 6–7.

MPW next asserts that Harry Hickey, controller for the P & D Automotive Division of Facet, falsely testified that MPW had been credited for several of its claims for defective merchandise. Specifically, Mr. Hickey testified that the credit claims represented by Plaintiff's Exhibits ["PX"] 103, 106 and 107 had been honored. Rec., Vol. XXV at 38–39. In so testifying, Mr.

Hickey was relying upon documentation compiled as Defendant's Exhibit ["DX"] 26. By comparing the MPW credit requests represented by PX 103, 106 and 107 with the P & D credit memos and corresponding MPW credit requests contained in DX 26, it appears that none of the credit requests in PX 103, 106 and 107 were, in fact, honored. Rather, those three credit requests appear to have been intermingled in DX 26 with other credit requests that were properly honored.

 The trial court concluded that Mr. Hickey's credibility and the assessment of his testimony were properly issues for the jury. We agree. In order for a new trial to be granted on the ground that a witness willfully testified falsely to a material fact, the perjury must be clearly established. *Hunter v. Thomas*, 173 F.2d 810, 812 (10th Cir.1949). MPW simply fails to meet this burden. Although it is clear from an examination of DX 26 that the credit requests represented by PX 103, 106 and 107 were not honored, contrary to Mr. Hickey's testimony, it does not necessarily follow that Mr. Hickey's testimony in that regard was willfully false. Indeed, it is possible that Mr. Hickey was simply mistaken and that PX 103, 106 and 107 were inadvertently intermingled with credit requests that had, in fact, been honored. Where the court is left to speculate as to whether erroneous testimony was inadvertent or intentional, perjury has not been clearly established.

 MPW also complains that the documentation upon which Mr. Hickey based his testimony was not provided to it prior to trial, despite repeated requests therefor during pre-trial discovery. When Facet offered DX 26 into evidence, MPW asked for a moment to review the exhibit and indicated to the court that the documents had not been disclosed to it prior to trial. Rec., Vol. XXV at 6-7. The trial court allowed MPW to examine the exhibit, whereupon MPW proceeded to cross-examine Mr. Hickey. When the trial court subsequently asked if MPW had any objection to admission of DX 26, MPW replied in the nega-

tive. *Id.* at 32. MPW now argues that Harry Hickey's testimony in connection with DX 26 created a "trial by ambush," inasmuch as Facet had never before raised the affirmative defense of payment. By acquiescing in the admission of DX 26 and by failing to object on the record to Mr. Hickey's testimony concerning alleged payment of the credit requests in question, MPW waived its right to raise those issues on appeal.

MPW also contends that the trial court erred in permitting the question of notice of breach to go to the jury. The contract provisions allegedly breached concerned credit for returned merchandise (¶ 10); credit for defective merchandise (¶ 11); wholesaler changeover costs (¶ 12); and return of inventory on contract cancellation (¶ 19). PX 1. MPW also sought damages for nonpayment of cooperative advertising monies it claimed it was due. PX 111.

Paragraph 10 of the contract between Facet and MPW governed return privileges and required MPW to "write [Facet] for permission to return [any obsolete, surplus, or slow-moving inventory], which will be promptly granted." PX 1 at 2. We cannot determine from the record whether MPW sent the requisite written request to Facet to support its claim for returned merchandise credit under this provision of the contract. If MPW did, in fact, send the requisite written request, Facet received sufficient notice of the claim as a matter of law, and there was no notice question for the jury to consider with respect to that claim.

Paragraph 11 of the contract governed defective merchandise returns, and provided as follows:

Since the WD and its wholesaler customers have no means to determine the propriety of claimed defective items by the wholesalers trade, such items may be returned to the manufacturer by collect transportation expense for merchandise credit at prices in effect at time of return; *or, such items will be inspected and destroyed at the WD's warehouse by the representative of [Facet] and [Facet] will render the merchandise*

*credit at prices in effect at time the material is destroyed.*

PX 1 at 2 (emphasis supplied). MPW's defective merchandise claims were represented at trial by MPW credit requests, designated as PX 93–110. Harry Hickey, Facet's sole witness on the breach of contract claim, testified that Facet had not credited MPW's account for the credit requests set forth in PX 93–102, 104–105, and 108–110 because the necessary documentation to support those requests had never been received. Rec., Vol. XXV at 37–38. Virtually all of those credit requests were, in fact, signed by a Facet representative.

MPW argues that Facet received sufficient notice of its defective merchandise claims, as a matter of law, when MPW tendered the merchandise in question to Facet representatives at the MPW warehouse, and Facet representatives thereupon signed MPW's credit requests for the merchandise in question. In most instances, the Facet representative referred on the signed credit request to an affixed listing of the part numbers for which the requested credit was due. (Whether the Facet representative who signed off on a credit request retained a copy thereof is not clear from the record; the record is also mute as to what the customary procedure was for assuring that credits were made once approved by a Facet representative.) We agree with MPW that at such time as Facet representatives inspected the allegedly defective merchandise at MPW's warehouse and then signed MPW's credit requests, the Facet organization received notice of those claims as a matter of law. As to those credit requests that were, in fact, signed by Facet representatives, there was thus no notice question for the jury.

Paragraph 12 of the contract provided that if MPW were successful in selling a wholesaler the line of the manufacturer, "[MPW] and/or the representative of [Facet] [would] change over the wholesaler's stock to that of [Facet]." PX 1 at 3. There is no express notice requirement in this provision of the contract. Rather, the question of notice thereunder is governed by the general contract principle that a party to a written contract who intends to assert a breach of its terms must act reasonably to inform the adverse party of the intended claim of breach. *Hidalgo Properties, Inc. v. Wachovia Mortgage Co.*, 617 F.2d 196 (10th Cir.1980). Under Oklahoma law, an injured party may inform his opponent of the breach either "by a demand for the payment ... or by a counterclaim...." *Spurgin v. Bennett*, 196 Okla. 673, 168 P.2d 134, 136 (Okla.1946). By including the claim for changeover costs in its counterclaim, MPW provided Facet with sufficient notice of that claim, and thus there was no notice question for the jury in regard thereto.

Pursuant to ¶ 19 of the contract, either Facet or MPW could cancel their contract with sixty (60) days written notice. In the event MPW cancelled, it was Facet's prerogative to accept back MPW's inventory, for cash credit. PX 1 at 3–4. We are unable to determine from the record whether the requisite 60-day written notice was given by MPW. To the extent such notice was given, there was no notice question for the jury to consider in connection with MPW's claim for return of inventory.[1]

---

1. Since the contract provisions in question here concern the provision of services rather than the sale of goods, arguably the notice provisions of the Uniform Commercial Code do not apply. *See, e.g., Dixie Lime & Stone Co. v. Wiggins Scale Co.*, 144 Ga.App. 145, 240 S.E.2d 323 (Ct. App.1977) (notice not required for breach dealing with service aspect of contract). We note in passing, however, that even if the U.C.C. were determined to govern the contract issues before us, MPW has done all that is required of it under the applicable notice provisions of the U.C.C. *See, e.g., Okla.Stat.Ann., title 12A, § 1–* 201(26) (West 1963) (notice is given when a buyer takes such steps as may be reasonably required to inform the seller in ordinary course; notice is received by a person when "it comes to his attention" or when "duly delivered ... at any ... place held out by him as the place for receipt of such communications"), *id.;* § 1–207(27) ("Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction.").

Finally, MPW's claim for nonpayment of advertising monies allegedly due was based upon a letter to Wayne Saunders of P & D from N.B. Pryor of MPW, dated July 10, 1980, in which MPW contended that it was entitled to $11,363.72 in cooperative advertising monies. PX 111. It is clear that the letter gave Facet notice of this claim as a matter of law, and thus there was no jury issue in that regard.

■ In summary, it appears that there was no factual question as to notice with respect to most, if not all, of MPW's claims for breach of contract. By instructing the jury that MPW must prove, by a preponderance of the evidence, that it had given reasonable notice to Facet of the claimed breach, the trial court implied that a question of fact existed as to that element of each breach of contract claim. The giving of such an instruction constituted reversible error, and MPW is entitled to a new trial on its breach of contract claim.

## II. Robinson-Patman Act Claims Concerning Sales to Keystone

Keystone, a one-warehouse automotive parts operation, was a competitor of MPW's warehouse in Kansas City ["MPW–KC"] from 1976 to 1980. Prior to 1976, Keystone purchased its ignition parts from Standard Motor Products ["Standard"], a competitor of Facet. In 1976, however, Keystone became dissatisfied with its Standard line, and was considering an offer from another of Facet's competitors when Facet approached it and offered to become its ignition parts supplier. Keystone agreed to become a Facet customer in exchange for a variety of special terms. For example, Facet permitted Keystone to pay for its initial order of P & D merchandise over a term of four years, and granted Keystone unlimited merchandise returns during the same period of time. Keystone also received, *inter alia*, discounts of up to 50% on certain merchandise, special sales meetings and prizes to attract additional customers, and the services of a full-time sales representative.

MPW–KC, which had been a P & D customer since the 1930s, was allowed three months to pay for its P & D orders, and was confined to returns of 5% of its annual purchases from P & D. MPW argues that neither MPW–KC nor its customers were ever offered anything close to the same terms or benefits afforded Keystone, or their proportional equivalent, in the Kansas City market, and that those discriminatory terms gave Keystone a distinct and substantial advantage over MPW–KC in the resale of P & D products. MPW charged Facet with violations of §§ 2(a), (d) and (e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(a), (d) and (e), in connection with Facet's sales and promotional services to Keystone. The trial court submitted MPW's Keystone claims to the jury, which returned a verdict in Facet's favor. The trial court subsequently denied MPW's motion for judgment n.o.v. or a new trial on those claims.

On appeal, MPW argues (1) that the trial court erred in distinguishing between new and existing customers in connection with the price discrimination claimed under § 2(a); and (2) that the trial court erred in permitting evidence and argument on offers made by Facet to MPW warehouses outside the Kansas City market, and in failing to give curative instructions to the jury.

### A. Section 2(a) Price Discrimination Claim

Section 2(a) of the Robinson-Patman Act makes it "unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ... *where the effect of such discrimination may be substantially to lessen competition....*" 15 U.S.C. § 13(a) (emphasis supplied). The trial court's general instruction to the jury concerning the element of lessened competition was as follows:

The Robinson-Patman Act is designed to protect and foster competition. This

law does not have as its purpose the protection of individual competitors.

You are instructed MPW must show the acts or omissions of Facet may have created a reasonable possibility of a substantial lessening of competition to prevail on its claim under [§ 2(a)] of the Robinson-Patman Act. You are further instructed it is not sufficient for MPW to show only loss of sales or other individual injury to MPW without also demonstrating a reasonable possibility of lessening of competition in the marketplace generally.

In your determination whether the price discrimination about which MPW complains had a possible adverse effect on competition, you are instructed if a price discrimination is substantial in magnitude, you may presume such discrimination injured competition unless you find Facet has proved otherwise.

Rec., Vol. XXVI at 1334. In a subsequent instruction, the court advised the jury that it could consider whether the offering of special discounts in price to new customers, as an inducement to purchase Facet's products, would tend to lessen or to promote competition. The court's instruction in that regard read, in pertinent part, as follows:

In considering whether any price discrimination made by Facet created a reasonable possibility of a substantial lessening of competition, you are instructed you may consider whether the offering of special discounts in price to new customers as an inducement to purchasing Facet's products would tend to lessen competition substantially.

You are further instructed you may also consider whether the offering of such special discounts in price to new customers would tend to promote, rather than inhibit, competition. If you find and determine the offering of special discounts to new customers as an inducement to purchasing Facet's products tended to promote, rather than inhibit, competition, you should find there was

no violation of Section 2(a) of the Robinson-Patman Act

Rec., Vol. XXVI at 1337.

The trial court based its "new customer discount" instruction on the case of *Interstate Cigar Co. v. Sterling Drug, Inc.*, 1980–2 Tr. Cases ¶ 63,430 (S.D.N.Y.1980), *aff'd*, 655 F.2d 29 (2d Cir.1981), which dealt with a discount distribution allowance offered to new distributors of Haley's M–O. In that case, the trial court concluded, and the appellate court affirmed, that the new distributor discount plan did not "bear the stigmata of illegal price discrimination," because the plaintiffs had failed to prove that the inequality in pricing structure for Haley's M–O tended to discourage competition. *Id.* at ¶ 76,253, 655 F.2d at 31. As the Second Circuit observed, "the discount offered to new distributors may well have increased competition by inducing newcomers to enter the M–O distribution field." 655 F.2d at 31.

■ MPW argues that the Act requires a seller to treat new and existing accounts in a proportionally equal manner, and the fact that a favored customer is a new account is insufficient to justify price discrimination. We do not read the trial court's instructions to state that new accounts are to be treated differently than existing customers. Rather, the trial court's instructions properly focus on the fact that the discriminatory pricing must be shown to have created a reasonable possibility of lessening competition in the marketplace generally. This accords with the Supreme Court's finding, in *Falls City Industries v. Vanco Beverage*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983), that "[t]o establish a prima facie violation of § 2(a), one of the elements a plaintiff must show is a reasonable possibility that a price difference may harm competition."

■ MPW also argues that Facet's discrimination was sufficiently substantial in magnitude to establish the necessary competitive injury as a matter of law. As the trial court instructed the jury, competitive injury can be presumed where substantial price discrimination between competing

purchasers is established. "In the absence of direct evidence of displaced sales, this inference [of competitive injury] may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits." *Falls City Industries*, 428 U.S. at 435, 103 S.Ct. at 1289.

MPW's evidence concerning competitive injury consisted of projections by its expert economist of MPW–KC's lost sales and lost profits, based upon the yardstick of growth patterns in five other MPW warehouses. Rec., Vol. XXIII at 1000–23. As Facet established on cross examination, the projected lost sales and profits were attributed solely to Facet's deal with Keystone, and did not take into consideration MPW–KC's competition from the approximately 8–10 other warehouse distributors in the Kansas City market. *Id.* at 1045–47.

■ MPW presented no evidence that it was undersold by Keystone, or that increased competition from Keystone forced it to take action such that its profit margin was affected. Indeed, the causal connection between MPW–KC's estimated decline in sales and Facet's price discount to Keystone was tenuous at best. Moreover, even if the jury had found some causal connection between the price differential and MPW–KC's estimated lost profits and sales, "[t]he naked demonstration of injury to a specific competitor without more is not sufficient to show that a price discrimination 'may' substantially lessen competition; the test must always focus on injury to *competition*.... [citations omitted] [emphasis in original]. [N]either section 2(a) nor any other provision of the antitrust laws was intended to protect competitors as opposed to competition." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 548 (9th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984).

■ We find no error in the trial court's instructions concerning competitive injury. It was for the jury to decide whether the competitive injury element, as well as other elements, of MPW's § 2(a) claim had been met. The jury found in Facet's favor, and

that finding is not against the weight of the evidence. We therefore affirm the trial court's denial of MPW's motion for judgment n.o.v. or new trial with respect to its § 2(a) claim arising from the Keystone sales.

**B. Alleged Discrimination in Promotional Services and Allowances under §§ 2(d) and 2(e)**

Sections 2(d) and 2(e) of the Robinson-Patman Act prohibit the discriminatory provision of promotional services and allowances designed to promote the resale of a product. Section 2(d) makes it unlawful to pay or to accept anything of value for promotional services or facilities furnished "unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution" of the product involved. 15 U.S.C. § 13(d). Section 2(e) makes it unlawful "to discriminate in favor of one purchaser against another purchaser ... of a commodity bought for resale ... by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms." 15 U.S.C. § 13(e).

■ Unlike § 2(a), neither § 2(d) nor § 2(e) requires a showing that the discriminatory practice at issue tends to lessen competition, and a defendant may not rebut a *prima facie* case under these sections by showing that his discriminatory practice, in fact, tended to enhance competition. *F.T.C. v. Simplicity Pattern Co.*, 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959). Rather, §§ 2(d) and 2(e) are addressed to specific practices thought detrimental to competition and thus constitute *per se* prohibitions. *Id.* at 65, 79 S.Ct. at 1011; *also see* P. Areeda, *Antitrust Analysis* ¶ 752 (3d ed. 1981).

MPW argues that the jury verdict against it on its § 2(d) and § 2(e) claims should be reversed because the trial court

erroneously admitted evidence, permitted argument, and refused to give a clarifying instruction regarding offers made by Facet to MPW warehouses in cities other than Kansas City. Facet made those offers in an effort to convert the various MPW warehouses that carried Standard products to P & D products. MPW rejected each such offer. In MPW's view, discrimination under the Robinson-Patman Act must be assessed on a location-by-location basis, and thus the jury should not have been allowed to hear evidence and ruminate upon offers outside Kansas City, inasmuch as those offers could have no bearing on the alleged discrimination in the Kansas City market.

▆▆ "[T]he determination of whether proffered evidence is relevant is a matter committed to the discretion of the trial court." *Beacham v. Lee-Norse*, 714 F.2d 1010, 1014 (10th Cir.1983); *Beck v. Quik-Trip Corp.*, 708 F.2d 532, 535 (10th Cir. 1983). This court may not disturb the trial court's decision absent a showing of clear abuse of discretion. *Id.* Moreover, if there was error in the admission of evidence, we will set aside the jury verdict only if the error prejudicially affected a substantial right of MPW. Fed.R.Civ.P. 61; Fed.R.Evid. 103(a); *Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp.*, 571 F.2d 1144, 1149 (10th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978).

The trial court initially admitted the evidence of other offers to ascertain whether it was industry practice to offer substantial terms and benefits in order to capture a new account. Rec., Supp. Vol. I at 6–12. At that time, the court agreed with MPW's counsel that the extraneous offers had no bearing on the ultimate issue of causation, injury and damages to MPW–KC. *Id.* Although the trial court recognized that "offers made to MPW outside the Kansas City market area did not bear on the alleged discrimination against MPW in Kansas City," Appendix F to Appellee's Brief at 4, it nonetheless reasoned that evidence concerning those offers was relevant to the issue of whether Facet afforded MPW proportionally equal treatment with respect to new or opening order accounts. *Id.* In its order denying MPW's motion for judgment n.o.v. or a new trial, the trial court offered the following rationale for admitting the evidence of other offers:

The only evidence offered by either party concerning opening orders in the Kansas City market area were the terms offered to Keystone.... Since MPW was a long-established customer, there was no occasion for Facet to offer MPW an opening order ... in that market area ... and hence, there were no opening order offers with which to compare the offer made to Keystone for the purpose of determining 'proportional equality' in the Kansas City market.... Accordingly, without more, the jury would have been asked to make a determination of proportional equality in a vacuum. As the Court explained to counsel when Facet first attempted to offer evidence relating to offers made by Facet to MPW in an attempt to sell to MPW warehouses in locations other than Kansas City, in the Court's view, such evidence was relevant on the issue whether Facet afforded this plaintiff equal treatment with respect to opening order or new account discounts, albeit in locations other than Kansas City.

*Id.* at 3–4.

Implicit in the trial court's repeated references to "the Kansas City market" is the determination that Kansas City was, in fact, the relevant market area for purposes of evaluating MPW's § 2(d) and § 2(e) claims. Although the trial court made no precise ruling on that point, for the purposes of this appeal we are assuming, by implication, that the court found the relevant market to be Kansas City as a matter of law.

Throughout the course of the trial, Facet sought to characterize MPW as a single entity with multiple warehouses, and thus to convey the impression that offers made to and rejected by MPW warehouses outside the Kansas City market were some-

how relevant to the question of injury to MPW–KC. The trial court clearly rejected Facet's premise that MPW was one, inseparable entity when it declared that "offers made to MPW outside the Kansas City market area did not bear on the alleged discrimination against MPW in Kansas City." *See* Court's Order Overruling Motion for Judgment Notwithstanding the Verdict and for a New Trial at 4.

Testimony at trial established that MPW–KC was owned by a different corporation than the other MPW warehouses to which Facet made offers, Rec., Vol XX at 56 (testimony of Marshall L. Yantis), and that MPW–KC was a separate profit entity in a separate market area from those other warehouses. *Id.* at 55–56; Vol. IX at 6–7 (testimony of John M. Yantis); Vol. XXI at 763, 784–85, 822 (testimony of Robert Null). Indeed, Jack Ladner, one of Facet's major witnesses, admitted that a proposal made to an MPW warehouse in a city other than Kansas City would not have affected MPW–KC. Vol. XI at 89–90.

The trial court's admission of Facet's offers to MPW warehouses outside the Kansas City area simply cannot be reconciled with the fact that discrimination under the Robinson-Patman Act is judged by market area. The Act, by its express terms and as interpreted by the courts, is concerned with discrimination among customers standing in some competitive relationship with one another. Section 2(d) expressly prohibits discrimination in promotional services and facilities "unless such payment or consideration is available on proportionally equal terms to all other *customers competing in the distribution*" of the product involved. 15 U.S.C. § 13(d) (emphasis supplied). Section 2(e) prohibits provision of such services and facilities where the seller does not accord "all purchasers" proportionally equal terms. 15 U.S.C. § 13(e). Although § 2(e) does not expressly require that the purchasers be competitors, that provision has been held applicable only to discrimination among purchasers with some competitive relationship. *F.T.C. v. Simplicity Pattern Co., supra;* P. Areeda, *Antitrust Analysis* ¶ 752 (3d ed. 1981).

It is undisputed that MPW–KC and Keystone were direct competitors in the Kansas City market, while none of the MPW warehouses to which Facet made offers competed in that market.[2] Thus, whether offers made to MPW warehouses outside Kansas City were proportionally equal to the benefits conferred upon Keystone by Facet is irrelevant for the purposes of determining whether Facet discriminated against MPW–KC. Pursuant to §§ 2(d) and 2(e), Facet was required to offer MPW–KC proportionally equal services and benefits to those afforded Keystone, regardless of the fact that Keystone was a new account and MPW–KC was a long-established customer.

■■■ We conclude that it was a clear abuse of discretion for the trial court to admit evidence of Facet's offers to MPW warehouses outside the Kansas City area. Such evidence had no relevance to the question of alleged discrimination between Keystone and MPW–KC in Kansas City. The trial court's error was compounded when it refused MPW's request that an instruction be given to the effect that only offers in Kansas City were pertinent to the case. Rec., Vol. XXVI at 1348. Counsel for Facet then spent the bulk of his closing argument reviewing the offers made to MPW outside of Kansas City. Rec., Vol. XIII at 19–40. Indeed, Facet's defense to the Keystone claims consisted almost entirely of evidence regarding those extrane-

---

**2.** Although Facet readily concedes that Keystone was "one of MPW's competitors" at the time Keystone became a P & D distributor, *see* Brief of Appellee at 3, Facet nonetheless argues that the two WDs were not "competing customers" because both enterprises did not become Facet distributors at reasonably contemporaneous times. In so arguing, Facet relies upon the case of *England v. Chrysler Corp.,* 493 F.2d 269 (9th Cir.), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). That case, however, is distinguishable. In *England,* the trial court found and the appellate court affirmed that the plaintiff and the allegedly favored customer were not competitors. In the case at bar, it is clear beyond cavil that MPW–KC and Keystone were competitors at the time the allegedly discriminatory benefits were given to Keystone.

**398**

ous offers. With such emphasis placed upon that evidence, the jury in all likelihood premised its verdict thereon, to MPW's substantial prejudice. *See University City v. Home Fire & Marine Insurance Co.*, 114 F.2d 288 (8th Cir.1940) (where incompetent evidence is given great prominence and is emphasized before the jury, it is highly prejudicial). We therefore find that MPW is entitled to a new trial on its § 2(d) and § 2(e) claims arising from Facet's dealings with Keystone.

In light of our determination that MPW is entitled to a new trial on the various claims delineated above, the award of attorneys' fees and interest is vacated.

**REVERSED.**